NUTT v. NUTT.

4-8596                                             214 S. W. 2d 366

Opinion delivered November 1, 1948.

*Owens, Ehrman & McHaney* and *Paul Johnson,* for appellant.

*A. James Linder,* for appellee.

SMITH, J. This appeal involves the custody of Frieda Nutt, the infant daughter of Wayne U. Nutt and his former wife, Judy. The custody of the child was awarded to the father under the decree from which is this appeal. The parties were married April 12, 1941, and their only child, whose custody is the subject of this litigation, was born July 6, 1942.

Appellee, the husband and father, was drafted into the military service on May 21, 1943, in which service he continued until discharged, during which time he served overseas eleven months and seventeen days. During appellee's absence overseas his wife secured employment in New York City, but at appellee's request she returned to Hamburg, Arkansas, the home of appellee, where they had first resided after their marriage. They lived together in Hamburg for about two months when appellee was discharged from the military service, after which

he reënlisted for a period of three years. He has attained the rank of sergeant and contemplates army service as a career. He was sent to an army post in South Carolina, and his wife accompanied him there, but she soon went to New York.

Appellant had met, while living in New York, a man named Tucciarone, with whom she became infatuated, and with whom she corresponded during her residence in Hamburg, and after accompanying her husband to the army post. She gave a letter written to Tucciarone, while living in Hamburg, to her husband to be mailed, but instead of mailing the letter, appellee kept it and it was offered in evidence at the trial from which is this appeal. The correspondence continued after appellant took up residence at the army post.

Appellee filed suit for divorce at Hamburg in Ashley county, in which he alleged the infidelity of his wife, and prayed that he be awarded the custody of their child. He caused a copy of the complaint, with the summons for appellant's appearance in Ashley county, to be served upon her in New York. According to appellant, appellee promised her that if she did not contest the divorce she might retain custody of their child. This appellee denied, but appellant is corroborated by the fact that she signed a waiver of service and entered her appearance in the Ashley chancery court. Evidently both parties secured legal advice thereafter. Appellant consulted an attorney in New York, who advised her that the Chancery Court in Arkansas could grant the divorce, but could not deprive her of the custody of the child while it remained in New York.

Appellee paid appellant another visit, after she had been served with a copy of the complaint, which she and Mr. Tucciarone had read. This complaint not only prayed a divorce but asked for the custody of the child and alleged appellant's infidelity. Appellee found Tucciarone visiting in appellant's apartment. Tucciarone asked appellee why he had made the charge of infidelity, as it was unfair and untrue, and could not be proved, and appellee answered, ''Well, I am just putting that in to

secure myself.'' Appellee did not deny this conversation when he testified at the trial, but he did deny the testimony of Tucciarone to the effect that he said, ''I only want the baby a few months out of every year. You can have the baby, but in order to make sure I am leaving it that way, so that if I get ready for her (the baby) you will let me have it.'' Tucciarone proposed that an agreement be signed as to the custody of the child, but none was signed.

Appellee paid appellant another visit in which he stated that he would like to take the child to the zoo, and it was understood that the child would be returned when they had visited the zoo. Appellee was permitted to take the child to the zoo, as appellant supposed, but appellee left and came to Arkansas. After waiting for the return of the child until she became convinced that appellee had abducted it, appellant applied to the police to return the child, but was informed that without a court order the police could take no action, as appellee was the father of the child. After getting possession of the child in the manner stated, appellee left post-haste for this state.

Appellee does not deny that he obtained custody of the child in the manner stated. He was interrogated as follows: Q. ''When you went to New York in May, 1947, to get the child, did you tell Judy (appellant) that you were going to bring the child home?'' He answered: ''No, I did not tell her. I had as much right to it as she had to move it previously.'' Q. ''You did not ask her permission to take it out (to visit the zoo)?'' And he answered, ''Yes, but not to take it away from the home.''

In other words, after appellee obtained custody of the child by a representation which was false as to his intention only to take the child to visit the zoo, he excused his false promise by saying that he had as much right to move the child as his wife had when she previously took the child from their home at the army post without his knowledge or consent.

Appellant testified that she did not know what had become of the child, whether it was taken to the army post in South Carolina, or to Hamburg, until the follow-

ing Sunday morning when a telegram received in New York at 11:36 a. m., was delivered to her, advising that appellee and the child had arrived safely in Hamburg. The case was heard the following day in Hamburg on oral testimony, and a decree was rendered awarding appellee the permanent custody of the child, and granting him an absolute divorce. Appellant later employed an attorney to go to Hamburg, who reported what had transpired in the court.

Appellant and Tucciarone consulted after the divorce had been granted, as to what action should be taken, and as to whether they should marry, but they postponed their wedding for fear it would prejudice their attempt to recover the custody of the child, until advised by counsel in Arkansas, who had been employed, that it would not have that effect. They were married September 11, 1947, and through their Arkansas attorneys filed suit to modify the decree so far as it awarded appellee custody of the child.

It is first insisted that the suit should be abated for the reason that the time within which an appeal might have been prosecuted had not expired when the petition to modify the decree was filed. But an appeal would have been futile as the decree was granted in an *ex parte* hearing on oral testimony, which could hardly have been reproduced. However, while appellant might have appealed, it was not required that she do so as she had the right to ask the modification of the decree without appealing from it. *Phelps* v. *Phelps*, 209 Ark. 44, 189 S. W. 2d 617.

The final decree from which is this appeal contains the recital that: ''There has been no change of condition subsequent to the entry of the original decree which would justify a modification of such decree.'' There is no other finding of fact, and the finding recited was evidently the basis of the opinion refusing to change the custody of the child.

We think, however, that the testimony shows a state of facts not presented to and known by the Chancellor in the original decree. It was not known by the Chancellor

that his jurisdiction over the child had been obtained through the fraud of appellee in inducing appellant to let him have the custody of the child to visit the zoo, when his purpose was to remove the child to this state from New York.

It was shown in the trial, from which is this appeal, that appellant was not allowed the right of visitation for which the original decree provided, except under the espionage of the grandparents of the child. Appellant visited the home of the grandparents and when she attempted to see the child privately, over the protest of the grandmother, a difficulty ensued in which appellant was thrown to the ground by the grandfather, who had her down on the ground with his hands in her hair, until a deputy sheriff was called to arrest appellant for an attempted abduction. Testimony was offered that appellant did in fact intend to abduct the child, and had arranged for transportation to Monroe, Louisiana, where she had arranged for an airplane to carry her to New York. This appellant denied, but if true, was unknown when the grandparents refused appellant the right to see the child privately. It was held in the case of *Phelps* v. *Phelps, supra,* where the custody of the infant child had been awarded to the father, with the right of visitation by the mother, that the refusal to permit the mother to see the child only under unpleasant surroundings, was a change in condition not contemplated by the decree, which warranted a change in the original order as to custody.

It appears also that the custody of the child was awarded to the father upon the condition that the grandparents should have the temporary custody of the child. Here the oirginal decree was rendered May 20, 1947, and the grandparents still have the custody. This is not the temporary custody for which the decree provided.

But without further recitation of the conflicting and somewhat voluminous testimony as to the original decree, we proceed to consider the question which controls in cases of this kind, that is, the welfare of the child.

In the case of *Reynolds* v. *Tassin,* 209 Ark. 890, 192 S. W. 2d 984, it was said: ''Regardless of whether the present proceeding be treated as one to modify the order of January 8, 1942, or the order of March 22, 1943, and, regardless of the regularity of prior proceedings, the first and paramount consideration of the court is the welfare of the child. The rule which this court has repeatedly announced is stated in *Kirby* v. *Kirby,* 189 Ark. 937, 75 S. W. 2d 817, as follows: 'It is the well settled doctrine in this state that the chancellor, in awarding the custody of an infant child or in modifying such award thereafter, must keep in view primarily the welfare of the child, and should confide its custody to the parent most suitable therefor, the right of each parent to its custody being of equal dignity.' ''

A decision of the question presented is always one of great difficulty, and as we have frequently said, we may be able only to make an order least harmful to the infant.

As opposed to the right of the mother to have the custody of the child awarded to her, these facts appear in the record. While still the wife of appellee, appellant became enamoured of the man she later married, who on one occasion accompanied her from the army post in South Carolina to New York. This man, his father and brother, own a restaurant in New York City, in connection with which they operate a bar where intoxicating liquors are sold, and on one occasion Tucciarone paid a fine for a violation of the liquor laws of New York City. It was shown, however, that it was quite common in New York City, in fact the usual practice even in the best restaurants, to operate a bar in connection with a restaurant, but appellant's present husband is not the bartender. A fine was imposed for the violation of an ordinance of the City of New York which prohibited the sale of intoxicants after 3:00 a. m. on Saturday night whereas, liquor was sold at 4:00 a. m. on that night. On other days, except Sundays, liquor may be sold until 4:00 a. m. Mr. Tucciarone admitted that his bartender had violated the ordinance by making the sale at 4:00 a. m. and that he, as owner of the restaurant and bar, had paid the

fine. Tucciarone does not reside in the building where the restaurant is located.

It was shown also that Tucciarone had been previously married and was the father of four children by that marriage, whose custody had been awarded to their mother. We do not know the conditions under which the divorce was obtained. Tucciarone testified that he made no attempt in that case to have the children awarded to him, as he thought their mother should have the custody, but that he paid regularly the sum of $45 per week, as directed by the divorce decree. So far as those children are concerned Tucciarone claimed only the right of visitation, and did not expect to take them into his home. He testified that he was much attached to appellant's little daughter, Frieda, and would be glad to adopt her if appellee would consent, and that he was able and would be glad to provide for the child's support and education, and that he had a five-room apartment, one room of which would be assigned to the child so that she might have a room of her own.

It was shown also that the grandparents, who now have, and who for more than a year have had the custody of the child, are devoted to it and are giving it loving care. The grandfather is now 76 years old and is troubled with asthma. The grandmother is 61 years old and suffered some years ago a nervous breakdown and for two months was a patient in the State Hospital for Nervous Diseases. She has, however, completely recovered her health.

The grandfather testified that before moving to Hamburg he had been engaged in farming, but he said nothing about owning the land he farmed. He is now employed as janitor of a church in Hamburg having 75 members, and is paid a salary of $100 per month. In addition, there is paid him $42 per month on account of the child, $20 of which is paid by the government, and $22 is deducted from appellee's pay. In addition appellee has made from his pay contributions of from $20 to $25 per month for the child's support. The child had little playmates and is occasionally taken to the movies by a brother of her father.

32

Appellee testified that he contemplated remarriage and had selected the woman he intended to marry, and was engaged to her. He also testified that the engagement to marry this lady, who was of good character, dated back to the time of the divorce. So that it appears that while appellant had become engaged to Tucciarone before the divorce, appellee had also become engaged to marry before being divorced.

It may be true, although the testimony does not establish the fact, that an illicit relationship existed between appellant and Mr. Tucciarone before their marriage, which Tucciarone categorically denied, but it was not shown that they cohabited as man and wife. It was shown that at one time he had a room in the apartment building in which appellant had her apartment, but on another floor of the building.

There is no question about Mr. Tucciarone's devotion and loyalty to appellant, who is now his lawful wife. He accompanied her to the trial at Hamburg, and has no doubt employed the counsel who are presenting her case to the court. He has an income of $8,000 per annum, derived from his salary, and the business of which he is a part owner, and he testified that it is his intention to give the child every advantage suitable to her station and his income.

Appellee does not question that the child will be properly taken care of if its custody were awarded to appellant, but he says he objects to its environment. Although Tucciarone is engaged in a business in connection with which a bar is operated, that is not his place of residence. Appellee was asked: "You do not contend, Mr. Nutt, that Judy Nutt (appellant) is not a person who would take care of the child properly and adequately?" He answered: "No, I do not contend that." He was asked: "You have never contended that, have you?" And he answered: "No."

We compare the conditions of the child under its possible environment. If the custody is not changed, the child will remain with its grandparents who will be her only companions in the home. If appellee does marry, as

he testified he intends to do, and sets up a home, it will be at an army post, from which appellee is subject to removal by the army at any time. We assume, although the testimony does not show, that appellee's second wife would welcome into her home a stepchild at the beginning of her married life, but even so this would not be a mother's care, which nothing can supply. We have many times said in cases of this kind that the custody of infant children is not awarded by way of reward to one parent or punishment to the other, but that the controlling consideration in all cases would be the welfare of the child.

In the case of *Thompson* v. *Thompson,* 209 Ark. 734, 192 S. W. 2d 223, it was held, to quote a headnote: "The father of a five-year-old girl procured a divorce from the child's mother on his cross-complaint. Held, that in the absence of testimony showing the mother to be an unfit person, she should have the custody of the infant." The fact is not stated, yet the implication is evident in that opinion that the mother had been unfaithful to her marriage vows, yet the custody of the child was awarded the mother. In the concurring opinion Mr. Justice McFADDIN said: "Where the mother had never abandoned the child, the custody of a child of tender years will not be taken from mother *solely* because of her infidelity to the husband." The cases cited by the concurring judge sustained his declaration of the law.

Here there is no intimation that appellant ever for a moment abandoned the child or surrendered its permanent custody. On the contrary, under the promptings of a mother's love, she had frantically sought to maintain its custody.

In view of the tender years of the child, we think the custody should be awarded to the mother, and it is so ordered, but a condition is attached to this order and made a part of it. Before appellant may remove the child from this state and take it to another, she shall execute a good and sufficient bond in the sum of $5,000 conditioned that the custody of the child shall depend upon any further order in that behalf, which the Chancery Court of Ashley county may make, and the showing may

be made at such time and in such manner as the court shall direct, and if the showing is made that the best interests of the child require its restoration to the father, that such order will be obeyed. The order which we here direct is subject to the condition that appellee may at any and all reasonable times visit the child and have the privilege of private interviews with it, but without interfering with its permanent custody.

The decree of the court below will, therefore, be reversed and the cause will be remanded with directions to enter a decree conforming to this opinion.

ED. F. McFADDIN, Justice, (dissenting). Little Frieda Nutt was born on July 6, 1942, in Ashley county, Arkansas, where her parents then lived. Her father entered the Armed Services, and her mother became enamored of another man. A divorce resulted. The mother has re-married and lives in New York City. The father is in the Army, and will shortly re-marry. Thus little Frieda, through no fault of her own, will never have what every child is entitled to: a home with both her natural parents. I maintain that when people bring a child into this world, then, as parents, they should make their first duties to be the maintaining of a normal home for such child. Each of Frieda's parents has failed her in this duty; and the Courts are now asked to decide Frieda's home.

What is for the best interest of this little child? That is a most difficult question. These child custody cases are the most serious ones to be decided. They require prayerful consideration. If a mistake be made in a case involving land or money, then the aggrieved party suffers only a financial loss; but if a mistake be made in a child custody case, then the entire life of the child may be ruined: "As the twig is bent, so the tree is inclined." On the cold printed page, that comes to this court, and without having seen the child or the parents, I cannot say that the Chancellor was in error. He saw the child, the parents and all the witnesses, and heard them testify. I am unwilling to reverse his findings.

I cannot agree to take this child from the paternal grandparents, who live in Hamburg, Arkansas, and give her to the mother who lives in an apartment house in New York City. In Hamburg, the child will be with her little first cousins. She will be sent regularly to Day School and Sunday School. She will grow up under conditions somewhere approaching normal. In New York, the child will be in an apartment building with her mother and step-father. He is the father of four other children, but he does not have them with him, so there is no showing that Frieda will have any little playmates in New York City. She was not regularly sent to Sunday School when her mother had her in New York City some time ago. It may be argued that Mr. Tucciarone (the step-father) will lavish money on Frieda in New York, and that the grandfather in Hamburg is only a janitor in a small church. But even so, I seem to remember the words of Holy Writ: "I had rather be a door-keeper in the house of my God than to dwell in the tents of wickedness."

On the whole case, I am not convinced that the learned Chancellor was in error in determining that the best interest of the child would be served by leaving her with her Christian grandparents in Hamburg. So I must respectfully dissent; and I am authorized to state that Mr. Justice MILLWEE joins me in this dissent.