Brown *v.* Brown.

4-9449     238 S. W. 2d 482

Opinion delivered April 2, 1951.

Rehearing denied April 30, 1951.

*Kenneth C. Coffelt,* for appellant.

*Clayton Freeman* and *Robert E. Diles,* for appellee.

Minor W. Millwee, Justice. This appeal involves the custody of a six-year-old girl, Bobbie Sue Brown. Susan Brown obtained a divorce from appellant, Leonard Brown, in the Pulaski Chancery Court in August, 1947, on the ground of general indignities and was granted custody of their three minor children of the ages of 6, 4

and 2 years, respectively. The parties had been separated about six months or a year before rendition of the decree which also directed appellant to pay $100 per month for support of the children.

After the divorce Susan and the two older children resided in the home of the children's grandmother, Mrs. Susie Summerville, at Traskwood in Saline County, while the youngest child, Bobbie Sue, remained in the home of her uncle and aunt, Mr. and Mrs. Mike H. Sullivan, in Little Rock, Arkansas. Mrs. Sullivan is Susan's sister. Appellant remarried May 1, 1948, and Susan remarried in December, 1949.

In January, 1950, appellant was cited for failure to pay support money as provided in the original decree and an order was entered which recites that Susan should retain custody of the children; that the two older children should remain in the home of the grandmother; and that Bobbie Sue should remain with the Sullivans. The order further directed appellant to pay $50 a month for support of the two older children and make a "private contract" with the Sullivans for the support of Bobbie Sue. The Sullivans never requested support money for Bobbie Sue and appellant has paid none. Susan died in March, 1950.

On September 2, 1950, appellant filed a motion to modify the original decree by awarding him the custody of his children. After a hearing, a decree was entered giving appellant custody of the two older children, but directing that Bobbie Sue remain in the custody of the Sullivans. This appeal is from that part of the decree denying appellant custody of Bobbie Sue.

The evidence discloses that appellant was in the armed services at the time of Bobbie Sue's birth and for six months thereafter, during which time Susan resided with the Sullivans and received the regular allotments from the government. After Susan moved to Traskwood with the two older children, she divided her time between the home of the grandmother and that of the Sullivans where Bobbie Sue remained. At the time of the hearing

Bobbie Sue had been with the Sullivans about two and one-half or three years, was nearly six years of age, and had started to school. The Sullivans have no children of their own and have furnished a good home for the child.

At the time of the trial appellant had been regularly employed for 19 months as maintenance engineer for a bakery. His present wife is also employed from eight a. m. to four p. m. Appellant defaulted in the payments of $100 per month as provided in the original decree, but made the reduced payments of $50 per month to Mrs. Summerville until he filed his motion for modification of the custody decree. He stated that he was out of work when he defaulted in the $100 payments and borrowed money to make partial payments. The amount of his default in the $100 payments is not shown. He frankly admitted that he had not visited the children as often as he should have, but stated that he had visited Bobbie Sue nearly every Friday, which was his day off from his work. He and his present wife were buying a home and paying on an automobile at the time of the trial and his wife planned to quit work as soon as the car was paid for. In the meantime they planned to have the seventeen-year-old sister of appellant's present wife live with them and help care for the children. Appellant's present wife testified that the children had visited in their home at different times, that she got along well with them and was willing and able to care for them. Both appellant and the Sullivans were renting their homes at the time of the hearing.

The general rule applicable in cases of this kind is stated in 27 C. J. S., Divorce, § 314, as follows: "On the death of a parent, the power of the court over custody of the child derived from the divorce action, together with the effectiveness of the decree, terminates, and the surviving parent ordinarily succeeds to the right of custody. So, in a proceeding between the surviving parent and a third person, the parent, if fit, is properly awarded custody, but where the surviving parent is an unfit associate for the child or has not evidenced an affectionate and

solicitous attitude toward the child, its custody will not be taken from respectable relatives of deceased parent.'' In an exhaustive annotation in 128 A. L. R. 990 it is stated: ''It is a general rule that where the custody of children is granted to their mother by a decree of divorce, such custody does not forever cut off and bar the father's right to their custody so long as the decree is unmodified, but only establishes the right of custody between the two spouses during their lives, and that upon the death of the mother her right does not descend nor can it be transmitted, but that the right of the father to the custody of the children is revived, provided, of course, he is a person suitable for the custody of the children.''

In Keezer, Marriage and Divorce (3rd Ed.), § 725, the rule is succinctly stated, as follows: ''Upon the death of the spouse given custody the right to such custody usually devolves upon the surviving parent unless such survivor is unfit or the best interests of the child would otherwise require.'' See, also, Schouler, Divorce Manual, § 316; 17 Am. Jur., Divorce & Separation, § 689. In all cases affecting the custody of infants, this court has repeatedly stated that the interest and welfare of the child is the primary and controlling consideration by which courts are to be guided. Justice ROBINS, in the opinion in *French* v. *Graves,* 205 Ark. 409, 168 S. W. 2d 1108, said: ''The paramount consideration in this case, as in all other cases involving the custody of a minor child, is the welfare of the child, but the rights and feelings of the parents must also be weighed and due regard given to the natural desire of the parents to have and rear their offspring.'' In several recent cases we have repeated our approval of the following statement from *Johnston* v. *Lowery,* 181 Ark. 284, 25 S. W. 2d 436: ''The law recognizes the preferential rights of parents to their children over relatives and strangers, and where not detrimental to the welfare of the children, they are paramount, and will be respected, unless special circumstances demand that such rights be ignored. *Herbert* v. *Herbert,* 176 Ark. 858, 4 S. W. 2d 513; *Loewe* v. *Shook,* 171 Ark. 475, 284 S. W. 726.

"The courts will not always, however, award the custody of an infant to the father, but, in the exercise of a sound discretion, will look into the peculiar circumstances of the case, and act as the welfare of the child appears to require considering primarily three things: '(1) Respect for parental affection, (2) Interest of humanity generally, (3) The infant's own best interest.' " The facts in every custody case are different and no hard and fast rule can be laid down in determining what is best for the permanent welfare of the child. *Kirk* v. *Jones,* 178 Ark. 583, 12 S. W. 2d 879.

It is clear from a consideration of our own cases and the authorities generally that appellant is entitled to the custody of his child unless he is an unsuitable person to be entrusted with its care, or the circumstances are such as to render such custody inimicable to the best interests of the child. The facts and circumstances in the instant case do not warrant the conclusion that appellant is an unfit person to have custody, or that he has forfeited the preferred right which the law gives him. The chancellor recognized this by giving him custody of the two older children. The question whether the child's permanent welfare demands that it remain with its uncle and aunt is most perplexing and one that is, of course, fraught with speculation. This opinion could be unduly extended by listing arguments on both sides of the question. Both appellant and the Sullivans are apparently able to furnish a suitable home for the child. Unless exceptional circumstances are involved, this court has indicated that young children should not be separated from each other by dividing their custody. *Vilas* v. *Vilas,* 184 Ark. 352, 42 S. W. 2d 379. To affirm the decree appealed from would mean the continued separation of Bobbie Sue from her brother and her sister as well as the loss of companionship and guidance of a father. Under all the circumstances, we have concluded that the permanent welfare of the child would be best served by allowing appellant to have the custody of all his children. That part of the decree awarding custody of Bobbie Sue to the Sullivans is accordingly reversed and the cause remanded with directions to award such custody to appellant.

GRIFFIN SMITH, Chief Justice, dissenting. When Bobbie Sue's mother procured a divorce from appellant, the parents had been separated for six months, hence Bobbie Sue was a year and a half old when her father's acts of indignities directed toward the mother of his three children justified the chancellor in granting a divorce and in awarding the mother full custody of all of the children.

As the majority opinion points out, there were subsequent court proceedings disclosing appellant's want of respect for the duties of fatherhood. There is a presumption—conclusive in the absence of an appeal—that considerations of sound social policy motivated the decrees and orders. Appellant did not provide the means of support found by the court to be necessary, but that is not the question here.

The mother's sister and the sister's husband—Bobbie Sue's uncle and aunt—took the infant at a tender age and have bestowed upon her all that love can supply or that material means require. The father stood by with an attitude of partial contempt in respect of court orders directing him to contribute to the little girl's support; and he permitted bonds of love and affection to grow to such an extent that the foster parents, and the child who is now six years of age, each look upon the other with emotions that fondness acquired through association, and love instilled through reciprocal dependence, alone can supply.

Of paramount consideration is the child's welfare. If I could be persuaded that the father (who turned from the mother of his three children in her hour of direst need, and who to the extent of his parental responsibilities allowed the discarded mother's sister and her husband to compensate Bobbie Sue for his errancy and the frailties of his nature)—if I could believe that this father is now a better person, and that he and his young wife would follow a course that would erase from the infant's active consciousness the substituted ties of parenthood the uncle and aunt have supplied, then I would say that these relatives who have done so much for Bobbie Sue could have no alternative but the satisfaction that comes

to those who have served well in circumstances of extraordinary duty, and their reward would be memories of childish laughter and the recollection of things that entered into a beautiful relationship abruptly brought to an end.

But the record does not justify this degree of punishment in a crisis where the father's fault destroyed a home and transplanted his youngest offspring into an environment where love and solicitude have supplied the deficiencies he brought about.

I know that my associates who make the majority opinion have been beset with doubts. Their problem has not been lightly treated, nor has the result been reached without conscientious consideration. It is therefore with reluctance that this dissent is written; but, feeling as I do, there is no other course.

Ed. F. McFaddin, Justice (Dissenting). As I have stated in a previous dissenting opinion,[1] these child custody cases are the most serious ones we are called upon to decide. The best interest of the child is the primary concern; but to determine what is such best interest requires prayerful consideration.

The Judges making the majority opinion in the case at bar have earnestly and conscientiously tried to ascertain what is for the best interest of the little girl, Bobbie Sue Brown, now 6 years of age; and I trust future events will prove the majority to be correct. But, with what I hope is also equal earnestness and conscientiousness, I have likewise tried to ascertain what is for the best interest of the little child; and I am convinced that the little girl should remain with the aunt (Mrs. Paralee Sullivan), just as the Chancellor decreed; and we must remember that he personally saw the parties, whereas we see only the typed record.

Here is the situation as I visualize it: the father, Mr. Leonard Brown, never had the care and custody of the little girl; even during the lifetime of the natural mother

---

[1] See *Nutt* v. *Nutt*, 214 Ark. 24, 214 S. W. 2d 366.

the aunt, Mrs. Paralee Sullivan, had the care and custody of little Bobbie Sue Brown; the stepmother (Mrs. Tessie Brown) is only 22 years of age and has never reared any children; by the court order made, she suddenly has the responsibility of being a mother to the two older children, Betty Jean, age 9, and James Earl, age 7.

I think that the care and custody of *two children* is enough burden to put on the young stepmother at one time. She works at the State Health Office from 8:00 A.M. until 4:00 P.M. In order to get two children dressed and ready for school, with lunches prepared, and her husband off to work, and herself to work by eight o'clock, this stepmother will have to get up about 5:30 every morning. All this is going to prove terribly trying. I feel that we should see how she gets along with the care of the two older children before we trust her with a third child, the little girl, Bobbie Sue, only 6 years of age. If Mr. and Mrs. Brown successfully shoulder the responsibility of caring for the two older children, then a year from now, or later, the Court can, in the light of such experience, review the situation to see what would *then* be for the best interest of the little girl, Bobbie Sue.

As previously stated, the stepmother is at work from 8:00 A.M. to 4:00 P.M. The little girl will doubtless get out of school 3:30 each afternoon, since she is in the elementary grades. When she reaches home there will be no one to greet her and look after her until the stepmother gets there sometime after 4:15 P.M. Again, suppose the little girl should get sick or hurt at school, who is to care for her until the stepmother's return home at 4:15 P.M.? During the time of school vacation the children will be alone all day without proper supervision which presents a worse problem than during the school term. Little girls should not be left to roam at will.

Contrast all the foregoing with the conditions that prevail in the home of the aunt, Mrs. Sullivan, where the real mother placed the little girl, and where the Chancellor ordered that she remain: the aunt stays at home all day; she has no other children to look after; she has no outside work; her life is devoted to looking after little

Bobbie Sue whom she has practically reared to her present age. So for the next few years of the little girl's life I think it would be better to leave her with her aunt, Mrs. Sullivan, who already knows her, rather than to place her with a "new mother" who does not know the little Bobbie Sue and who will certainly be very busily occupied with the two older children and with her work at the Health Department. Because of these reasons, I dissent from the majority.

Mr. Justice Holt concurs in this dissent.