PARKS v. CROWLEY.

4-9932                                                253 S. W. 2d 561

Opinion delivered December 15, 1952.

Rehearing denied January 19, 1953.

*Ward, Coleman & Mayes,* for appellant.

*Kirsch & Cathey* and *Gerald Brown,* for appellee.

J. SEABORN HOLT, J. This suit involves the custody of Pamela Crowley, a little girl about five and one-half years of age at the time of the trial. Appellant, Frances Parks (formerly Frances Crowley) is the natural mother of the child and appellees are its paternal grandparents. Jack Crowley, the child's father, is not a party to this action. According to this record, he has never shown the slightest interest in Pamela and has never provided a home or any support for her. In fact, it clearly appears that he has, in general, proven a great disappointment to his parents (appellees) who reared him. On February 28, 1949, Frances married Parks and they now have a son two years of age. The record discloses that on September 4, 1946, Jack Crowley secured a Florida divorce from Frances and seven days later, she gave birth to Pamela. Shortly thereafter, Frances took her baby to the home of her parents in Paragould and later secured employment to support herself and child. During this period, Frances had allowed the child to stay in the home of its paternal grandparents (appellees) a greater part of the time. Appellees are good people and their affection for the child and desire to care for it are not questioned. This arrangement continued until January 23, 1951, when appellees, feeling that the conduct of Frances and her mother was so bad that the child's welfare, while with Frances in her mother's home, was endangered, decided to keep the child permanently in their own home, and refused to allow Frances to have her at all. Thereupon, appellant, Frances, filed suit for Pamela's custody. A hearing resulted in a decree for

appellees on findings that while Frances was not guilty of immoral conduct, she was addicted to drink and frequent profanity to such an extent as to make her unfit to have the custody of the child. She was allowed, however, to visit the child at all reasonable times.

The present suit was filed by Frances November 13, 1951, seeking a modification of the above decree of July 23, 1951, on the grounds of such changed conditions since its rendition that would warrant transfer of custody to appellant. Trial was had February 6, 1952, and the court, after a patient and painstaking hearing, declined to disturb the child's custody and this appeal followed.

We try the case *de novo* here.

In determining the custody of a minor child or the modification of an award of custody thereafter, the welfare of the child is the controlling consideration. In such cases, unfortunately we have no definite yardstick as a guide. Each case must stand on its own facts. Here, while the trial court has continuing authority to alter its orders affecting custody and control of this minor child, such order should not be changed "without proof showing a change in circumstances from those existing at the time of the original order, which changed circumstances, when considered from the standpoint of the child's welfare, are such as to require or justify the transfer of custody from one parent to the other." *Myers* v. *Myers,* 207 Ark. 169, 179 S. W. 2d 865.

The burden is on appellant who is seeking the modification.

In this connection, we have certain definite and approved general rules to govern us in reaching a decision.

"The paramount consideration in this case, as in all other cases involving the custody of a minor child, is the welfare of the child, but the rights and feelings of the parents must also be weighed and due regard given to the natural desire of the parents to have and rear their offspring." *French* v. *Graves,* 205 Ark. 409, 168 S. W. 2d 1108.

In *Servaes* v. *Bryant,* 220 Ark. 769, 250 S. W. 2d 134, we said: " 'There can be no question in the law that, as between a mother and grandparents, the mother is entitled to the custody of her child, ''unless incompetent or unfit, because of poverty or depravity, to provide the physical comforts and moral training essential to the life and well-being of her child,'' *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389; *Baker* v. *Durham,* 95 Ark. 355, 129 S. W. 789.' *Loewe* v. *Shook,* 171 Ark. 475, 284 S. W. 726.

" 'The law recognizes the preferential rights of parents to their children over relatives and strangers, and where not detrimental to the welfare of the children, they are paramount, and will be respected, unless special circumstances demand that such rights be ignored,' " (Citing several cases) and in *Holmes* v. *Coleman,* 195 Ark. 196, 111 S. W. 2d 474, this court said: "Courts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life."

In considering this case, we do not lose sight of the fact that we are dealing with the welfare of a little girl of the tender age of five years when obviously she is most in need of the loving care of its real mother unless the mother is so depraved morally or otherwise as would render her unfit to have her child. While appellees have had her custody for most of her life, when the real mother shows that she is entitled to its custody, we must know, human nature being what it is, that the love and attachment of this little girl for her grandparents (appellees) cannot have become so deep rooted and attached that it could not, within a very short time, be transferred to her real mother by proper treatment, love and care, if given the opportunity. Appellees concede that Parks, the stepfather, is a good man and have found no fault with him. He works regularly, earning from forty to fifty dollars per week, and is willing to provide an ample, though modest home. He wants the child and

is willing to support her. The evidence on which the first decree, above, was based showed that Frances (as well as her mother) was addicted occasionally to excessive drinking, to frequenting "beer parlors," and to the use of profanity. The court found that there was no evidence of immorality. Since that decree, Frances appears to have quit drinking, has joined the church, and her conduct improved.

The Chancellor's findings recite in part: "It is an action upon the part of the mother to regain custody of the child who has spent very little of its five years and ten months approximately, or eleven months, in her custody. The testimony before the Court in July, 1951, related largely to the conduct or misconduct upon the part of the mother and stepfather of this infant child. The Court felt at that time and has not changed his opinion that the testimony that showed that up until the time they left Paragould in February, 1951, their conduct had been such that it would not justify a recognition of the parental love and take the child away from its paternal grandparents. The evidence was insufficient to show to the satisfaction of the Court that their conduct since leaving in February, 1951, had been changed to such an extent to change their [his] view of their conduct when they were here. The Court found that the environment in which the child would be taken was not conducive to its best interest. It is indeed gratifying to me to learn that the outward conduct at least of the mother and stepfather of this child has certainly and unquestionably improved to the extent that they have since that time refrained from frequenting places of ill repute and indulging——I don't mean anything except an alcoholic standpoint is concerned—and indulging in drinking of alcoholic beverages and misconduct that is always incident to the excessive use thereof. I am glad and delighted to know that they have taken some interest in spiritual and religious affairs and I hope that conduct will continue and grow better. I hope they are sincere in their statements of reformation in that connection. Unfortunately, ill feeling has arisen between the two families involved in this case and I think that's been manifested

by the bad judgment exercised by both sides since the hearing in July, 1951. In this case I had the benefit of evidence more than I did in the other case because, as I say, the evidence in the other case was directed largely to the accusation and denial of the conduct and misconduct of the parties involved. I had the benefit in this hearing of testimony that gives me a better insight and better view concerning the environment and surroundings that this child will be surrounded with wherever she might be. * * *

"This child has been with its paternal grandfather and grandmother for many years, ties of love and affection have grown up between them. The child is of a nervous disposition, she is visibly confused—affected by the confusion backwards and forwards between the two families. Taking into consideration her own attitude and all of the testimony before the Court and after having weighed it carefully and given it much thought, not only in the courtroom but outside the courtroom, I have reached the conclusion in my judgment that it would not be for the best interest of this child to disturb her custody at this time."

It appears from the record that the court, by agreement of counsel, during the course of the trial, privately talked to Pamela at some length and she, in effect, expressed the desire to remain with her grandparents. In the Chancellor's findings, he stated that he was influenced in his decision by what he learned in his personal, private interview with the child. Even though, as appears, this child was interviewed by agreement, still we are bound to attach little, if any significance or force to her testimony on account of her tender age. By our statute (§ 28-601, Ark. Stats. 1947) infants under the age of ten are incompetent to testify, in a civil case.

Without attempting to detail the testimony, much of which is in conflict, when all is considered, we have concluded that appellant has by a preponderance of the evidence shown such a change in circumstances since the date of the order of July 23, 1951, and the date of the hearing in the present case (February 6, 1952) as to

justify, and require, a modification of the July decree and the transfer of custody of her child to her, with privilege of visitation by appellees at reasonable times.

Accordingly, the decree is reversed and the cause remanded for further proceedings consistent with this opinion.

The Chief Justice and Justice McFADDIN dissent.

ED. F. McFADDIN, Justice (dissenting). In my dissenting opinion in the case of *Nutt* v. *Nutt,* 214 Ark. 24, 214 S. W. 2d 366, I stated my views and expressed my feelings in a child custody case wherein the facts, in most determinating respects, were similar to the facts that exist in the case at bar. The views expressed in the Nutt case impel my dissent in the present case. I summarize my views in the present case:

(1) The Chancellor saw the parties and heard the testimony. He concluded that the little girl would be better cared for if left with the grandparents. We have only the cold print before us, and I am unwilling to reverse his findings.

(2) There had been a previous hearing in this case on July 23, 1951, wherein the custody was awarded to the grandparents. The present hearing was on February 6, 1952; and the Chancellor evidently found a lack of bona fides in the alleged change of circumstances. I believe he was correct.

(3) When a mother leaves her small child with grandparents and goes off with another husband, the mother necessarily expects the love of the child to go to the grandparents. In such a situation, the mother, having abandoned her claim of priority, should not be allowed to again reassert it. In reversing the Chancellor, the majority is accomplishing such a result.