KALE PAYNE *v.* E. LEROY JONES ET UX

5-4195                                                 415 S. W. 2d 57

Opinion delivered May 29, 1967

*Spencer & Spencer* and *Don Gillaspie*, for appellant.

*J. S. Thomas* and *Bernard Whetstone*, for appellees.

GEORGE ROSE SMITH, Justice. This is a habeas corpus proceeding by which the appellant, Kale Payne, seeks to obtain custody of his son, Dean Thomas Payne, who was two years and two days old when Kale's petition was filed on November 24, 1965. The original defendants were the Reverend and Mrs. E. Leroy Jones, appellees, to whom the child's mother, Betty Jean Payne Ford, had attempted to give the child. Mrs. Ford intervened in the case; but she has not appealed from the decree, which found her to be unfit to have the child. The pivotal question is whether Kale has forfeited his right, as against strangers, to have the custody of his own son. We find the chancellor's conclusion that Kale is unfit to have the custody of his child to be against the weight of the evidence.

Both of the child's parents have been married three times. Kale first married his present wife, Marilyn Sue, in 1957, when they were both children—eighteen and sixteen years old. That marriage ended in divorce in August, 1959. A year later Marilyn Sue bore a son, concededly fathered by her former husband, Kale.

After that divorce Kale was drafted and served two years in the army, stationed in Texas and Kansas. He testified that he meant to remarry Marilyn Sue, but he met Betty Jean Admire in Kansas City, started going with her, and eventually married her in 1961. That marriage was not a happy one. The couple had separated five months before their child—the infant now in controversy —was born in Dallas on November 22, 1963. Kale obtained an uncontested divorce in Missouri on February 3, 1964. The decree awarded custody of the child to Betty Jean and directed Kale to pay $30 a month to support

the child. Four days later Kale remarried his first wife, with whom he has lived in apparent harmony ever since.

Betty Jean Admire was a divorcee when she married Kale in 1961. After her second divorce she married William J. Ford (whom she met in a bar) on March 4, 1965, and bore his son six weeks later. Their marriage has been marked by one or more separations. In a period of about eighteen months Betty Jean lived for a time in at least five states: Arizona, Arkansas, Georgia, Mississippi, and Texas. In July, 1965, she decided to give away both her children, because, as she testified, she was unable to support them. She gave Dean Thomas Payne to the Joneses and gave her other son, Rickey Dale Ford, to another couple who also live in El Dorado, Arkansas.

Kale learned of the situation in August or September of 1965, when he was asked to consent to his son's adoption by the Joneses. Kale refused that request and at once filed a petition in the Missouri divorce case to win back the legal right to the custody of his child. The Missouri court, after the child's mother had been served by warning order, granted the requested change of custody on November 15, 1965. Nine days later Kale filed the present habeas corpus proceeding against the Joneses, who had had the child in their home for about four months. There was almost no proof about the Joneses' fitness to have the child, but in the view we take that omission is immaterial.

To take a parent's child away from him and give it to strangers is an extreme measure—a step which the courts should and do take only when the evidence clearly justifies such a course. Here, as a practical matter, the award of custody to the appellees would in all probability deprive Kale of his child just as permanently and just as effectively as if the boy had been adopted by the Joneses. In *Woodson* v. *Lee,* 221 Ark. 517, 254 S. W. 2d 326 (1953), we said that the right of natural parents to the custody of their children, as against strangers, is "one of the highest of natural rights, and

the state cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent." We also said that "abandonment by a parent, to justify in law the adoption of his child by a stranger without his consent, is conduct which evinces a settled purpose to forego all parental duties continued for a prescribed period of time when the statute so provides. Merely permitting the child to remain for a time undisturbed in the care of others is not such an abandonment."

In the case at hand there is no sound basis for finding that Kale abandoned his son. Dean Thomas was only two and a half months old when his parents were divorced. It was to be expected that the court would award custody to the mother. Needless to say, no finding of abandonment can be based upon Kale's acquiescence in his former wife's custody of the baby. We pointed out in *Brown* v. *Brown*, 218 Ark. 624, 238 S. W. 2d 482 (1951), that a divorce decree awarding a child to the mother merely establishes the right of custody during the lives of the two parents. Upon the death of the mother (or, as here, her surrender of her claim to custody) the father's right to custody is revived.

It is argued that Kale evinced an intention to abandon his son by failing to pay part of the hospital expenses when the child was born and by frequently being late in forwarding the monthly support payments. Most of the hospital bill was paid by the Government, as Kale was in the service. Betty Jean's mother paid the rest and is not shown to have requested reimbursement. We all know that fathers are often tardy or even completely remiss in making support payments, but that does not prevent them from regaining custody of their children. In the *Brown* case, *supra,* the father was cited for contempt for his failure to support his children, but he nevertheless regained them after their mother's death. Here Kale testified without dispute that he made or tendered all the payments that accrued before Betty Jean relinquished possession of the child to the Joneses.

It is also shown that Kale did not send presents to his son and saw him only twice (once in the hospital and once in Missouri) before this proceeding came on for trial. We certainly cannot attach controlling importance to such conduct with respect to a child so young as to be unable to appreciate his father's presents or presence. Betty Jean testified that at one time Kale agreed that Ford might adopt the boy. Kale denies that statement, but even if it were true there is all the difference in the world between relinquishing a child to his mother and stepfather and relinquishing him to perfect strangers. There is concrete evidence of Kale's desire for his son in the promptness with which he brought this proceeding and in the steadfastness with which he has pursued it.

Apart from Kale's unhappy marital experiences the only testimony tending to prove his unfitness to have his son comes from the Fords and is manifestly tinged with venom. They say that Kale drank about nine cans of beer and used profanity during a protracted interview in Missouri, when the Fords succeeded in collecting four months of back support money by threatening to file suit. Kale denies that testimony, but in any event the incident was far too trival to serve as a basis for depriving Kale of his son.

On the other side of the ledger the affirmative proof of Kale's fitness is convincing. Except for his military service Kale has held the same job with General Motors for eight years, earning three dollars an hour as an assembly-line worker. He and his wife and their son live in a permanent trailer park in Kansas City. They take their son to church. Five close neighbors testified that the Paynes are of good character, that their home is clean and well kept, and that their child is neat and well behaved. The testimony of those disinterested witnesses effectively rebuts the biased statements coming from the Fords. Finally, it is of course desirable that Dean Thomas have the companionship of his half brother while the two boys are growing up.

The decree must be reversed and the cause remanded for the entry of a decree awarding custody to the child's father, with reasonable visitation rights in the mother. Since it is plainly desirable that the change of custody be made as soon as possible an immediate mandate will be ordered, as in *Tassin* v. *Reynolds*, 222 Ark. 363, 260 S. W. 2d 462 (1953), to prevent the matter from being carried over until the court reconvenes in the latter part of the summer.

HARRIS, C. J., and BROWN, J., dissent.

CARLETON HARRIS, Chief Justice dissenting. The cardinal rule in deciding child custody cases, so often stated as to need no citation of authority, is that the court makes its determination in accordance with the best interests of the child.

I cannot consider, under the testimony in this case, that the little boy's best interest is served by his custody being awarded to the father. It appears, from the evidence, that, although he had only been ordered to pay $30.00 per month for the support of the child, Payne was frequently tardy in making these payments, and there is evidence that he was at one time behind in the amount of $120.00. When the little boy, Dean, was born, the government paid part of the hospital expenses, and Payne's wife and her mother paid the balance. Apparently, no support has been paid at all since July, 1965. This father, according to the record, had not seen this child from the time that Dean was two weeks old until the time of this court hearing. Payne's present wife had never seen the child before the court hearing.

The majority opinion is somewhat critical of the witnesses who testified to the effect that appellant is not a proper person to have the custody of his son, mentioning that this testimony is "manifestly tinged with venom." I can only point out that the Chancellor saw these witnesses when they testified, and, of course, had a much better opportunity to determine which witnesses

were telling the truth. He reached the conclusion that Payne was not a proper person to have custody of the child, and that the little boy's welfare would be best served by leaving his custody with Reverend and Mrs. Jones.

It is true that there is no testimony in the record relating to the Joneses, their character, or their suitability for custody of the youngster.

Accordingly, I would remand this case to the Union Chancery Court for the purpose of taking testimony relative to the character of Reverend and Mrs. Jones, their facilities for taking care of the child, etc., as a matter of determining the propriety of placing the custody of Dean with them.

I, therefore, dissent to the reversal.

LYLE BROWN, Justice, concurring in part and dissenting in part. I agree with the majority opinion insofar as it reverses the case. However, I disagree with that part of the opinion which vests custody of the child in Kale Payne. This does not mean I would presently award custody to Rev. E. Leroy Jones. I think the ability and desire of Rev. Jones to have custody should be further explored and made a matter of record. He did not testify at the trial. The father has a two-bedroom trailer and resides at a trailer park in Kansas City. He resides there with his wife and child and proposes to take young Dean there to live. The record before us is very limited with respect to the total environment in which the child will be placed. This is true whether custody be granted to Rev. Jones or to the father.

There were two hearings before the trial court. The first one was continued by the presiding judge for the stated purpose of calling upon the child welfare division of the state welfare department for assistance. It may well be that valuable information was furnished the trial judge, but it is not in the record.

From the present state of the record we must choose between a father whose past habits are not commensurate with a wholesome atmosphere for the child, and a third party about whom we know very little. If the trial court is in the same predicament—short of his judgment of the demeanor of the witnesses—then I contend the record needs to be more fully developed. If the trial court has information which is not in the record then the cause should be reopened in order that the record can be completed.