SERVAES *v.* BRYANT.

4-9810                                        250 S. W. 2d 134

Opinion delivered June 23, 1952.

---

*W. C. Medley,* for appellant.

*L. B. Smead,* for appellee.

HOLT, J. This case involves the custody of a boy seven years of age. Its parents were married in early 1943 and the child was born in December, 1943. There was a divorce in Calhoun County March 26, 1945. The decree was silent as to the custody of the child (Jimmie Bryant), who was then in his mother's care. Since this divorce, the mother has been twice married. She married her present husband, William Servaes, in December, 1947. April 4, 1946, the Ouachita Chancery Court entered an order dividing custody of Jimmie, the mother (appellant) to have him for six months each year and the father to have his custody for the next six months.

March 27, 1947, near the time when the mother was entitled to the child's custody again, she and her former husband, James J. Bryant, entered into an agreement which, in part, recited: "Whereas the Second Party (Margaret Servaes) is not at this time in position to

care for the child and furnish him a home it is agreed by and between the First Party and the Second Party that it is for the best interest of the said minor child, Jimmy Bryant, that he be left in the custody of the First Party who now has him and who is having the child cared for by his Mother, Mrs. Marie Bryant. That Mrs. Marie Bryant is at the present time the proper person to have the care of the said minor child, Jimmie Bryant.

"It is therefore agreed . . . that the Second Party will not make any effort to secure and take over the custody of the minor child, Jimmie Bryant, on April 19, 1947, and that the child will be left by both parties in the care and custody of its Grandmother, Mrs. Marie Bryant, who now has his care and custody at this time."

May 21, 1951, appellant, Mrs. Servaes, asked for a modification of the above 1946 order and prayed that custody of Jimmie be awarded to her for nine months of each year (during the school term) and that appellee, Mrs. Marie Bryant, the grandmother, have his custody, if she so desired, during the vacation period. Appellee, James J. Bryant, answered, praying that custody of the child be given to his mother, appellee, Mrs. Marie Bryant, and she intervened, joining him in this request for custody.

Trial resulted in a decree awarding custody to Mrs. Marie Bryant, the grandmother, with right of its mother and father "to visit said child at reasonable times." The grandmother has had custody of the child since March, 1947. This appeal followed.

A case of this nature is among the most difficult that comes to us for decision. It is our duty to try it *de novo* and unless we find that the preponderance of the evidence is against the Chancellor's finding, we must affirm. However, after carefully considering all the testimony presented, we have reached the conclusion that it preponderates in favor of the mother, appellant, Mrs. Servaes, and that the court erred in holding otherwise.

The present case is, in effect, a contest primarily between the real mother of the child, on the one hand, and

its paternal grandmother on the other. The child's father has remarried and for the past fourteen months has lived and worked in Corpus Christi, Texas. His testimony shows clearly that he does not want the child's custody himself. He testified: ''Q. You want your mother to have custody of the child because you think it will have better rearing and be better taken care of than it will be with its mother? A. Yes, sir. Q. That is the way you have felt about it all time? A. Yes, sir. . . . Q. You have never had the child in your custody, aside from your mother's custody? A. No, sir. Q. You are married again? A. Yes, I am.'' His present wife did not testify or evidence any interest in the child.

''There can be no question in the law that, as between a mother and grandparents, the mother is entitled to the custody of her child, 'unless incompetent or unfit, because of poverty or depravity, to provide the physical comforts and moral training essential to the life and well-being of her child,' *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389; *Baker* v. *Durham,* 95 Ark. 335, 129 S. W. 789.'' *Loewe* v. *Shook,* 171 Ark. 475, 284 S. W. 726.

'' 'The law recognizes the preferential rights of parents to their children over relatives and strangers, and where not detrimental to the welfare of the children, they are paramount, and will be respected, unless special circumstances demand that such rights be ignored. *Herbert* v. *Herbert,* 176 Ark. 858, 4 S. W. 2d 513; *Loewe* v. *Shook,* 171 Ark. 475, 284 S. W. 726.' '' *Brown* v. *Brown,* 218 Ark. 624, 238 S. W. 2d 482.

Of primary consideration is always the best interest and future well-being of the child, the innocent sufferer. Here, the evidence discloses that both the real mother of Jimmie and the grandmother, its paternal grandparents, are morally fit to have his care and custody. The mother had his custody for approximately sixteen months following his birth and her love and affection for him and her desire for his custody appears never to have ceased, although at times she appeared to be neglectful. Her actions in this respect, we think, may be explained from the fact that in the written agreement of March, 1947,

it was provided that the grandmother was "at the present time the proper person to have the care of the said minor child," and that she was ill at the time and during the following three years or more, she was hospitalized five times and underwent two major operations. She is now in fine health and her character has never been questioned. Her husband wants her to have her son. He is a heavy duty mechanic, employed by a construction company and earning "100 per week or better." He owns a home, "two trucks, two cars and an airplane to be exact, and everything is paid for." They live within three blocks of a school in Quenemo, Kansas, and will send the child to school. He further testified: "A. I am, and I will be glad to have him (Jimmie); and I am sure Margaret is. I think what the grandparents have done for him has been extremely good of them, and I don't think he should be taken completely away from them. . . . I wouldn't want her to have full custody; I think he should be with his grandparents some of the time. Q. But you do feel that he would be better off with you during the school term? A. From what I have seen, I know he would. He wouldn't live so far from the school; he could come home to lunch if he wanted to; and if he got sick there is a doctor right there close by that could be got in a few minutes. In fact, the doctor said he needed attention when we got him before."

As indicated, the boy's father and his present wife do not appear to want his custody. These grandparents have nine children (four at home) and are share croppers. While they appear to be good, honest, dependable people, and willing to care for the child, along with the other children as best they can, we fail to find from the evidence that such close ties have grown up between the grandparents and Jimmie that would cause us to say that it would be unfair, cruel, or for the child's best interests to refuse transfer of his custody to his real mother, as prayed in her petition.

In *Miller* v. *Miller,* 208 Ark. 1058, 189 S. W. 2d 371, in reaffirming the rule announced in *Baker* v. *Durham,* 95 Ark. 335, 129 S. W. 789, in a situation similar, in

effect, we said: " 'Nor does the evidence show that these grandparents were lavishing such wealth of attention upon this child as to render it inhuman, either to them or the child, to take her away from them and give her to her father.' . . . 'As between the parent and grandparent, or anyone else, the law prefers the former unless the parent is incompetent or unfit, because of his or her poverty or depravity, to provide the physical comforts and moral training essential to the life and well-being of the child.' "

The agreement above, between the father and mother of the child, was not incorporated in any court decree. It was not binding on the court or on the parties. We said in *Marr* v. *Marr*, 213 Ark. 117, 209 S. W. 2d 456, in reference to an agreement similar, in effect: "Even though she signed the agreement for appellee to have the child, this was not binding on appellant or controlling on the court," and in *Burnett* v. *Clark*, 208 Ark. 241, 185 S. W. 2d 703, we said: "Of course, this agreement, like any other agreement as to the custody of a child, was not binding, but it is of some importance as tending to show attitude at the time the original divorce suit was filed."

" 'In this connection it may be said that, whatever the result of the agreement between the husband and wife with respect to the custody and support of their minor child, such agreement does not affect the right of a court of equity to award the custody of the child to either parent and to make reasonable provision for its support and education.' " *Miller* v. *Miller*, 208 Ark. 1058, 189 S. W. 2d 371.

As indicated, we hold that the preponderance of the evidence shows that the real mother is in a better position to care for and rear this little boy and give him better advantages than the paternal grandparents, and it is to the child's best interests that its real mother have its custody.

The decree is reversed and the cause remanded with directions to enter a decree awarding custody of the child to its mother with the privilege of its grandparents to have his custody during vacation periods, if they so

desire, and the privilege of the father of visitation at all reasonable times.

The Chief Justice and Justice WARD dissent.