CHARLES MOORE *v.* GWENDOLYN MOORE JORDAN

5-5462                                    463 S. W. 2d 378

Opinion delivered February 22, 1971

*Gaughan, Laney, Barnes & Roberts,* for appellant.

*Streett & Plunkett,* for appellee.

GEORGE ROSE SMITH, Justice. This is a child custody case. When the parties were divorced in May, 1968, their daughter, Michelle Moore, was four months old. At that time the child's mother, now the appellee, was only twenty and had no home to which to take the child. Consequently the decree provided, by agreement, that custody was awarded to the child's father, now the appellant. Moore was then living with his own parents, the Floyd Moores. The award of custody was conditioned upon the child's being cared for by Mrs. Moore, Sr.

In June, 1969, the appellee married her present husband, Michael Jordan. The couple moved into the home of Michael's parents, a Presbyterian minister and his wife. The appellee then filed the present application for

a change of custody. Michelle was two and a half years old when the petition was heard. In granting the petition the chancellor made oral findings in which he stressed (a) the law's settled preference for custody in the mother when an infant girl is involved, and (b) the fact that this young mother is physically and morally capable of bringing up her own child. We do not agree with the appellant's contention that the chancellor felt compelled under the law to grant custody to the appellee. As we read the chancellor's findings, he exercised his discretion in the matter.

We agree with his decision. With respect to change of circumstances we had this to say in a closely parallel case: "At the time the father was given the custody of the children, the mother had no home, no way of supporting them, and no place to take them; but now she has a good home, a good husband, and a place for them. Thus there is a change of circumstances and we can not say that the court's order changing the custody of the children is not justified by the situation of the parties as it now exists." *Carlton* v. *Carlton*, 223 Ark. 870, 269 S. W. 2d 313 (1954); see also *Langston* v. *Horton*, 229 Ark. 708, 317 S. W. 2d 821 (1958).

Apart from the change of circumstances, other proof supports the chancellor's decision. There is no real question about the appellee's good moral character. It is true that she had an earlier marriage and divorce before she married the appellant, but that unfortunate experience on the part of an eighteen-year-old girl certainly does not call for a forfeiture of the precious privilege of bringing up her own infant daughter.

When the case was heard, the appellee and her husband were both 22 years old. Michael had completed his plans for entering the study of the ministry in the fall. While he had never seen the child, that was because the appellant had told the appellee not to bring Michael to the Moore's house, "because there would be trouble." Michael appeared as a witness in support of his wife's petition, stating his intention of giving to Michelle the same love that he would give to his own child.

. There is no question about the fine qualities of the Floyd Moores, a couple in their early fifties, who cared for Michelle during the two years just preceding the hearing in the court below. They are, however, the child's grandparents and naturally do not have a claim to custody as strong as that of the child's own mother. Moreover, some dislocation of Michelle's family ties is foreseeably unavoidable in any event. At the time of the trial the appellant was planning to remarry and to take Michelle to his new home eventually. Both he and his father testified, however, that Michelle was so deeply attached to her grandparents that the transition to the new home would have to be gradual. As the appellant put it: "We would leave her with my mother until we could work up to it." With that attitude on the part of both the father and the grandparents there is certainly a reasonable probability that the transition would not be an ideal emotional experience for the child. The chancellor might well have been unfavorably impressed by the appellant's manifest reluctance to take a step that should be taken as quickly and as painlessly as possible.

Affirmed.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. I certainly agree with the eminent chancellor that child custody cases are the most difficult and nerve-racking of all those addressing themselves to the courts. Nearly every decision is a heartrending one to me. I might well agree with the majority if I were convinced that the chancellor had treated this as a change in custody awarded by judicial decree. Even then, I would agree reluctantly, because the polestar in custody cases—the welfare of the child—leads me to the conclusion that custody should not be changed in this case. But I am convinced that the chancellor considered this case as if he were determining the original custody award. He was not. The decree of the court, not the agreement of the parties, determined child custody. It awarded the care and custody of the child to appellant, conditioned upon her

being cared for by appellant's mother, because of the child's age. This was a judicial determination. *Marr* v. *Marr,* 213 Ark. 117, 209 S. W. 2d 456; *Burnett* v. *Clark,* 208 Ark. 241, 185 S. W. 2d 703; *Henkell* v. *Henkell,* 224 Ark. 366, 273 S. W. 2d 402; *Servaes* v. *Bryant,* 220 Ark. 769, 250 S. W. 2d 134. Courts may not abdicate their responsibility for placing the custody of a child where its best interests require after appropriate investigation, regardless of agreements between the parents and their underlying motives. *Marr* v. *Marr,* supra. That the chancellor did not do so is best illustrated by the specification that award to the father was conditioned upon the child being cared for by his mother.

This proceeding began as one for change of custody because of changed circumstances. The changes alleged were: (1) remarriage of appellee; (2) plans of her third husband to study for the ministry; (3) denial of visitation privileges by appellant's parents; (4) her inability to "rest" and "know peace or happiness" unless permitted to have the child.

The latter two grounds certainly were no basis for changing custody in the best interests of the child. Child custody should never be based upon reward of one parent, punishment of another, or the welfare or gratifications of the feelings of either parent. *Caldwell* v. *Caldwell,* 156 Ark. 383, 246 S. W. 492; *Hamilton* v. *Anderson,* 176 Ark. 76, 2 S. W. 2d 673; *Miller* v. *Miller,* 208 Ark. 1058, 189 S. W. 2d 371; *Phelps* v. *Phelps,* 209 Ark. 44, 189 S. W. 2d 617. The evidence on the first two grounds was, in my opinion, wholly inadequate to justify a change of custody.

In resisting appellee's petition, appellant alleged that appellee maintained no interest or concern for the child prior to the parties' divorce and that the child was happy, well adjusted and contented.

To illustrate the chancellor's conception of the proper treatment of this proceeding, one need only refer to his oral findings at the conclusion of the hearing. Among them are these:

1. The law requires that custody of children of tender years be awarded to the mother.

2. Based upon that assumption the burden is on the father to show why the mother should not have custody.

3. One reason for denial of custody to the mother is physical incapacity rendering her incapable of caring for the child, which was not shown by the testimony.

4. Another reason is moral depravity, of which there was no evidence.

5. The mother gave satisfactory evidence of her necessities bringing her to leave the child with its father at the time of the divorce.

6. The Moores have taken excellent care of the child, and no one has even suggested that they have not done the right thing. They are fine people and have maintained a good home for the baby.

7. Under the law, there was no other decision the court could make than to award custody to the mother.

Since the chancellor seemed to treat this case as if it were an original award and erroneously placed the burden of proof upon appellant,[1] it is incumbent upon us to determine where the preponderance of the evidence lies. I find it to support appellant in that there are no such changes of circumstances as to make the child's best welfare served by changing its custody. This child was a bare four months old when custody was placed as it is. She has been nurtured, loved and cared for by her father, paternal grandparents and uncles and aunt in a good home until this hearing in the trial court when she was 2½ years old. Evidence of reciprocation of that love is overwhelming. The psychological

[1]*Marr* v. *Marr.* 213 Ark. 117, 209 S. W. 2d 456.

trauma of her transplantation from that environment to one which is uncertain and unstable, at best, may be immeasurable and irreparable. These are not mere notions of mine. The evidence supports them overwhelmingly.

A review of the testimony shows:

1. This 22-year-old mother is in the early months of her third marriage, the first two having been terminated by divorce. Her first marriage lasted from sometime in 1965 until March 1967. The second lasted from March 31, 1967, until May 28, 1968, seven months after her daughter's birth. This marriage took place June 6, 1969, about one year prior to the decree before us.

2. Appellee had left the baby with its father in February before the divorce and only kept it a week before returning it. This period covered a job-hunting trip. Appellant's mother had actually had the baby nearly all of the time since she was born. Mrs. Moore testified that appellee wanted to go to work and brought the baby to her daily after the child's birth, even before appellee got a job.

3. Appellee's search for employment on the eve of the divorce in places where she might have kept the baby were half-hearted to say the least. She spent one-half day looking for a job in Memphis and one day in Jackson. She had a job in East Camden, where she had been working before her separation from appellant.

4. Appellant's and his mother's testimony that appellee was very anxious for him to obtain a divorce seems to be supported by appellee's actions.

5. After the separation and prior to her new marriage, appellee lived in at least five different places, all within easy traveling distance

from the Moore home. Even though she denied statements by appellant that she had gone as long as 11 months without visiting the child, it is clear from her testimony that intervals between visits were sometimes extended over many months. She couldn't remember how often she had seen the baby over a 2½-year period.

6. Appellant plans to marry a school teacher, whom he has been dating since August 1968. The couple have been taking the child to Sunday School at the church where they are regular attendants and have deliberately attempted to bring about an acquaintance and understanding between the child and her prospective stepmother.

7. The Moores have a large home. There is no question about their devotion to the child and hers to them. The child has been provided with more than adequate facilities for play. There is considerable credible evidence that she is now a happy, healthy child. One witness said that she couldn't have a better home. Since both appellant and his prospective wife are employed, they plan to start keeping the child on weekends and later leaving her in appellant's parents' home during the daytime.

8. Appellee and her husband have had difficulties, which her present father-in-law said had "leveled out" in the preceding six months.

9. It is admitted that appellee's present husband has had a drinking problem, supposedly ended in November 1969.

10. Her husband has some vague plan about studying for the ministry in McKenzie, Tennessee. Appellee has never been there and never seen the student apartments which may be available for living quarters. She had given no

thought to how she and her husband would support themselves during his two years of school. Her husband did not make a trip to the school to learn about living conditions and costs until the eve of the custody hearing, and he went then upon advice of counsel. Even then he didn't even look at the apartments available. They will be dependent upon a scholarship for which her latest husband says he will be eligible. He did not know whether apartment rental which he would have to pay included utilities. He anticipated that he would be able to have employment at the school for 15 hours per week at $2 per hour. He said he had assurance of all the aid he needs from his present pastor and from his father. This assurance as stated by them is not definite in amount or regularity. He testified that he *thinks* he is going to the school but would abandon his dedication to the ministry if it developed that his going to school would prevent her from getting the baby, or if he found their means of support at the school inadequate. The husband testified that appellee definitely would not work if he went to school, but would stay at home all day.

11. There is evidence that the child has a fear of strange men.

12. Appellee testified that the only change in her daughter's condition was appellant's impending marriage and the statement of the Moores that they would keep the baby. She stated that her only desire was to get custody because she was the mother and now has a home for her.

The chancellor may have considered that this was a case where the real contest was between the mother and the grandparents and governed by such cases as *Baker* v. *Durham*, 95 Ark. 355, 129 S. W. 789; *Servaes* v. *Bryant*, 220 Ark. 769, 250 S. W. 2d 134; and *Miller* v. *Miller*, 208 Ark. 1058, 189 S. W. 2d 371. If so, I do

not agree. The original award of custody in *Baker* was *temporary* only and gave no consideration to its being placed in the custody of grandparents. The father, who sought change in custody, had always manifested his affection for the child and desire for its custody. The evidence tended to show that the mother to whom custody was originally awarded had left the country after turning the child over to her parents. The trial court had shifted the custody from the mother to her parents. There was nothing to show that the grandparents wanted the child or were better able to provide for it than the father. We said that the evidence did not show that it would be inhuman to either the child or the grandparents to give her to her father. It was there recognized that there are cases where the parent by indifference to the welfare of his child and lack of proper affection for it has voluntarily relinquished the parental obligations, privileges and pleasures to other hands for so long that the court will refuse to disturb the associations and environments which his own conduct has produced and will leave in statu quo those whom he has permitted to stand in loco parentis. If this is not such a case, then I do not expect to see one.

Custody was originally awarded to the mother of the wife in *Miller*. The father visited the children daily and manifested an interest in their welfare. He had remarried, and his new wife had several years' experience in housekeeping and caring for children. The maternal grandmother, unlike Mrs. Moore, was burdened with housekeeping for a group of eleven, six of them her own children under 18 years of age. The paternal grandfather, unlike appellant's father, was unable to work. The grandmother also cared for a second child of an unmarried daughter. They all lived in a 5-room house and had lived in four different places in as many years. There was testimony that the young son of the parties had learned to use profanity and had acquired other bad habits. The change of custody was ordered by this court because the father was in a position to provide a better home and more wholesome environment than the grandmother. The change was not based upon any

preference for the father over the grandparents, but upon the best interests of the children.

In *Servaes,* the original divorce decree was silent on custody. The mother kept the child until he was about 16 months old. Her love and affection and desire for custody were said to have never ceased. Over two years later the custody was divided upon the basis of 6-month periods. When the time for the mother's periodic custody came the parties entered into an agreement under the terms of which it was stated that the father's mother was the proper person to have the care of the child and that both parties would leave him there. The mother was ill at the time and during the ensuing three years or more she was hospitalized five times and underwent two major operations. When the mother sought custody for the school term, the father had remarried and then lived and worked in Texas. His testimony clearly showed that *he did not want custody himself.* His wife did not evidence any interest in the child. The mother's new husband was well established, owned a home, two trucks, two cars and an airplane. The home was within three blocks of a school. The grandparents were sharecroppers who had nine children, four of whom lived at home. The court failed to find any evidence that such close ties had grown up between the child and his grandparents as would cause us to say that it would be unfair, cruel or for the child's best interest to refuse transfer of custody to his mother. How different the present case is.

Nor do I agree that the authorities cited in the majority opinion are in anywise comparable. In *Carleton,* the father who had custody had four marriages, two of which were to the child's mother. One of the others lasted nine days and another 18, before separation. His own mother testified that he drank a great deal at one time. His marital status was uncertain. The paternal grandmother was found not always careful about her language. It was declared that the mother and her new husband would have a better home and better surroundings. The shoe seems to me to be on the other foot here.

In *Langston,* the father who had original *temporary* custody of the two daughters lived with his 76-year-old grandfather who cared for the children while the father was at work. The wife and her new husband had been married for two years. They worked for a year in Alaska to earn money with which to provide a home for her daughters. They returned to Washington where they made a down payment upon a home, and the husband obtained employment. The chancellor, whose decree was affirmed, was of the opinion that the children should be placed in the mother's home in preference to their remaining in a home where there was *no woman* to look after their needs. 1 find no similarity here.

I simply do not understand how the majority reaches its result. If ever the facts of a case called for denial of a change of custody, this one does.