Cook *v.* Haynie.

5-1795                                      321 S. W. 2d 201

Opinion delivered March 2, 1959.

*Lookadoo, Gooch & Lookadoo,* for appellant.

*Basil H. Munn* and *R. D. Rouse,* for appellee.

Sam Robinson, Associate Justice. This is a contest over the possession of two little girls who are now with their maternal grandparents. Their father sought their custody by a *habeas corpus* proceeding. It was the order of the chancellor that the children should remain with the grandparents, and the father has appealed.

The appellant, Richard R. Cook, and Dorothy Jean Haynie were married at Arkadelphia, Arkansas, December 29, 1953. Two children were born of this marriage, Melinda Ruth and Rebecca Jean. When this action was heard in the trial court, Melinda Ruth was about six months old and Rebecca Jean was something over three years old. On the 4th day of July, 1958, the mother, Dorothy Haynie Cook, came to her death as the result of a gunshot wound, in Nashville, Tennessee, where she and her husband and children were living at the time.

The record does not contain much evidence regarding the death of Dorothy, but it appears that shortly after the mortal wound was inflicted, Richard, by long distance telephone, called Mr. Haynie, Dorothy's father,

who lives at Prescott, Arkansas. Mr. Haynie, his wife, two daughters, and a minister, the Rev. Claude E. Shearer, and his wife, immediately left by automobile for Nashville. While they were in Nashville, Richard turned the little girls over to the Haynies, who brought them back to Prescott. Dorothy's body also was returned to Prescott, where the funeral was had on July 7th. Richard and his father and mother also went to Prescott. After the funeral, Richard and his parents went back to Tennessee. On July 31st, Richard returned to Prescott and at that time the controversy started which gave rise to this litigation.

Apparently Dorothy came to her death as a result of a shot from a .22 rifle. Perhaps it was suicide, but Mrs. Haynie, Dorothy's mother, was not satisfied with that theory, and she testified regarding a conversation with Richard as follows: ''Well, I was sitting in the living room and he (Richard) drove up and he came on in just like he was at home. We always treated him just like a member of the family and I try to treat him that way. He came on in and sat down and I started to ask him questions and he said, 'Well, I could tell you a lot of things but you will never know.' I said, 'Yes, we will; God will reveal it.' I said, 'Do you ever see Jean?' And he said, 'Sometimes,' and I said—he kind of went off— and I said, 'You killed Jean,' and he said, 'Yes, I did.' Then I went in the kitchen and my husband brought up the fact that he knew he didn't have any nerve because, you know, my son knocked him down for mistreating my daughter and he didn't raise a hand. He said, 'I would have shot him (the brother of Dorothy) if I could get my gun.' And I said, 'You would have shot my daughter, too, wouldn't you?' And he said, 'Yes, I did it.' Mr. Haynie said, 'Get up out of my house; I won't have that conversation in my house,' and he didn't stomp him. He (Richard) asked him (Haynie) three times to kill him. He said, 'I went down to the river bridge three times to jump in but I didn't do it.' Then someone called the officers and they come in and I called him up to the chair and he said, 'I am going to kill myself and leave a letter.' . . . I had Brother Shearer on the phone

and he said, 'Richard, you can't afford to do that.' "
On redirect examination Richard explained that when
he said he killed his wife he meant that he had loaded
the gun for the purpose of killing a snake; that he had
not actually killed her.

Three times Richard asked Mr. Haynie to kill him
and threatened to commit suicide. The Reverend Shear-
er advised him against that course. As a result of Rich-
ard's statement about having killed Dorothy, his boast
that he would have killed Charles Haynie if he could have
gotten a gun, and his asking Mr. Haynie to kill him, and
threats of suicide, Mr. Haynie picked him up and threw
him out of the house. The officers were called and
Richard was conducted from the premises and advised
to leave town, but he was not arrested.

There does not appear to be much controversy about
the facts as above outlined. The principal issues are in
regard to the circumstances involved in the little girls
being turned over to the Haynies in Tennessee; and
whether Richard sought to get possession of both girls
on July 31st or whether he merely asked that he be al-
lowed to take the older of the little girls with him; and
there is a very serious issue of whether Richard is so
situated that he is able to take care of the little girls.
The older girl is the beneficiary named in a $2,000 policy
of life insurance left by her mother, and the Haynies say
that Richard only wanted to take this girl with him on
July 31st and did not ask for the little baby. Richard
contends, however, that he asked for both girls.

Regarding the dispute as to the circumstances of
the children being turned over to the Haynies in Tennes-
see, Mr. Haynie quotes Richard as saying, among other
things, "Charlie, you can take the children on down to
your house and if there is any money coming to the
children I will see that you get it because I don't know as
I can ever send them any money." On the other hand,
Richard says he merely let Mr. Haynie have the children
until such time as he could make further arrangements.
Mr. Haynie testified that after the burial at the cemetery
Richard came back to town, got in a car with his father

and mother and was leaving town when he, Mr. Haynie, stopped him to inquire further about his intentions with regard to the children. At that time Richard said that, "If there is any social security coming, we will see that you get it so it will help take care of the children." Thereafter Richard never sent any money or anything else for the children. Incidentally, there is no income from social security or other like sources to help take care of the little children, except the $2,000 policy of life insurance left by the mother to the older child, and Mr. Haynie states emphatically that the money from that policy will be saved for the little girl.

Apparently Richard has never held a job for any substantial length of time and he has never supported his wife and children. Dorothy must have worked almost continuously since before the first baby was born or shortly thereafter, because she had worked for the Government for more than three years, and the older child was not four years of age at the time the mother came to her death. Richard testified that in the event the little children were given to him he intended to go to live with his father and mother and hire a maid at $40 a month to help look after the children. He stated that the maid would live on the premises. In considering this proposed arrangement, all of the essential facts must be reviewed. In the first place, Richard has never been able to make a living for his family. There is nothing to indicate that any sudden change has occurred that would enable him to do so immediately henceforth. Next, his father is not in good health; he has heart trouble, and he did not go to Dorothy's funeral on account of the condition of his heart. Richard's mother is crippled, in a helpless condition and confined to a wheel chair. So we have a situation where an unknown maid would have to look after the little baby in arms and the little three and one-half year old girl. This maid was not produced as a witness, and the court had no opportunity to pass judgment on her qualifications. On the other side of the picture, the Haynies have a good home; they are in sound financial circumstances. Mr. and Mrs. Haynie are still far from being old; they are both in their mid-40's.

They have a boy in college, a girl in college, and another girl in high school. Since the little girls have been with them, they have been doing nicely; the baby weighed only 14 pounds when she was turned over to the Haynies, and at the time of the trial she weighed 18 pounds.

Of course, the law is well established that it is only in exceptional cases that the custody of a child will be given to the maternal or paternal grandparents in preference to a parent. *French* v. *Graves*, 205 Ark. 409, 168 S. W. 2d 1108; *Holmes* v. *Coleman*, 195 Ark. 196, 111 S. W. 2d 474.

In the case at bar, we believe the special circumstances heretofore pointed out fully justified the chancellor in ordering custody to the grandparents.

Affirmed.

McFADDIN, J., not participating.