DUNCAN *v.* CROWDER.

5-2120                                                   339 S. W. 2d 310

Opinion delivered October 24, 1960.

*Rex W. Perkins, Charles Bass Trumbo* and *E. J. Ball,* for appellants.

*Wade & McAllister,* for appellee.

JIM JOHNSON, Associate Justice. This is a child custody case. On March 19, 1956, the Chancery Court of Tippah County, Mississippi, entered a decree of divorce in favor of Jeanne Duncan Crowder against her husband, Frank Lindoerfer, and awarded sole custody of said parties' minor child, Nettie Katherine Lindoerfer, then aged two years, to Jeanne Duncan Lindoerfer, appellee herein, but with the provision that the maternal grandfather, T. E. Duncan, one of the appellants herein, be awarded temporary custody of said minor child until such time as the child's mother was able to provide a suitable home for her child.

On August 23, 1958, the child's mother married James Alvin Crowder and on October 31, 1958, filed a petition for writ of habeas corpus in the Washington Circuit Court to obtain custody of her minor child from her maternal grandparents, the appellants herein.

The cause was subsequently transferred to the Washington Chancery Court and on July 17, 1959, the Washington Chancery Court entered a decree directing appellants to deliver custody of the child, then five years of age, to appellee on or before 12:00 o'clock noon, July 20, 1959.

On July 18, 1959, appellants filed notice of appeal to this Court and a supersedeas bond, which bond was approved by the Washington Chancery Court. On July 24, 1959, appellee petitioned the Washington Chancery Court for an order citing appellants to appear before the Washington Chancery Court and show cause why they should not be adjudged in contempt of the decree of the Washington Chancery Court rendered July 17, 1959, for failure to deliver custody of said minor child to appellee prior to 12:00 o'clock noon, July 20, 1959.

On July 29, 1959, the Washington Chancery Court entered an order dismissing appellee's petition for citation for contempt for want of jurisdiction and on August 12, 1959, three Justices of this Court during recess entered a temporary per curiam order subject to action of the Full Court referring the matter of fixing custody of

said minor child, pending appeal to this Court, back to the Washington Chancery Court.

On August 13, 1959, the Washington Chancery Court directed appellants to appear and show cause why the custody of said minor child should not forthwith be delivered to appellee, and on August 18, 1959, the Washington Chancery Court awarded temporary custody of said minor child to appellee pending determination of appellants' appeal to this Court and at the hearing approved a $1,000 bond filed by appellee conditioned to redeliver custody of said child to the jurisdiction of the Washington Chancery Court upon order therefor by either the Washington Chancery Court or this Court, following a final decision of the case upon its merits by this Court.

Upon reconvening, this Court entered on September 7, 1959, the following order:

"The temporary order made during recess confirmed. The trial court had discretion and power to fix custody pending our decision. There is no absolute right of supersedeas in child custody cases."

This appeal is now before this Court for a final determination upon its merit.

Appellee, Jeanne Duncan Crowder, is the only daughter of Talmadge Edward Duncan and Mary Evelyn Duncan, appellants herein. Mrs. Duncan is now over 58 years of age. Mr. Duncan is now over 60 years of age. The Duncans reside at 416 North Washington Avenue, Fayetteville, Arkansas. Nettie Katherine Lindoerfer, the appellee's first born child, was born March 23, 1954.

Mrs. Crowder lived with her daughter, Nettie, in the home of the maternal grandparents during the first year and a half of the child's life. During that period of time the mother rendered normal care for Nettie and evidenced love and affection for her. To better prepare herself to provide for her child Mrs. Crowder earned a master's degree at the University of Arkansas. This graduate study was pursued and accomplished with the

complete knowledge, consent and approval of the Duncans. Later Mrs. Crowder maintained an active interest, love, and affection for her minor child through cards, letters, gifts, and visits to her while participating in the doctoral programs in universities in Atlanta, Georgia, and New Orleans, Louisiana. During this time a divorce decree was rendered in favor of Mrs. Crowder by the Chancery Court of Tippah County, Mississippi, on March 19, 1956, in which decree the sole custody of Nettie was awarded to Mrs. Crowder with temporary custody of Nettie awarded to Mr. Duncan until such time as Mrs. Crowder could provide a suitable home for her daughter.

At no time did the Duncans challenge Mrs. Crowder's fitness as a mother of her lawful right to sole custody of Nettie until after it became evident to them that following their daughter's marriage to James A. Crowder that she was then able to provide a suitable home for the child.

The record is clear that at no time since Nettie's birth did Mrs. Crowder abandon her. Mrs. Crowder rendered the normal care any young mother would for her first born child, and although she was away from home for her graduate studies, she visited her daughter at the normal vacation periods such as Thanksgiving, Christmas, Easter and all other opportunities. The transcript lists the many letters and cards from Mrs. Crowder to Nettie which were recognized in Mrs. Duncan's letters to Mrs. Crowder; a list of gifts from Mrs. Crowder which were recognized in Mrs. Duncan's letters to Mrs. Crowder; and a list of Mrs. Crowder's gifts to Nettie which were not mentioned in Mrs. Duncan's letters to Mrs. Crowder. Six weeks prior to their wedding, on August 23, 1958, in the home of Mr. and Mrs. Duncan, Mr. and Mrs. Crowder discussed Nettie's future with Mr. and Mrs. Duncan. A discussion was held in a drug store in Blue Mountain, Mississippi, which resulted in a verbal understanding between them and the Duncans that Nettie would make several visits to the Crowders during the ensuing fall, winter, and spring, leading to her living with the Crowders permanently

after the spring or summer of 1959, this period of several months being considered as an adjustment period for all parties concerned.

Mr. Crowder, the son of a retired Baptist minister, is employed as a psychiatric social worker at the Southeast Louisiana Hospital and the Bogalusa Guidance Center, and earns in excess of $400 per month. He carries over $10,000 insurance upon his life with his wife as beneficiary. He also carries hospitalization insurance and an income protection insurance policy which would pay him $300 per month in the event of his disability. He holds a master's degree in social work from Louisiana State University; served as county director of Alabama Department of Public Welfare for a number of years, having administrative and supervisory responsibility for the county adoption and aid to dependent children programs. For two years he served as probation and parole officer of the local juvenile court. His moral character and general reputation are unquestioned.

Mr. and Mrs. Crowder rent a five room duplex apartment at 2118 Charlton Lane, Metaire, Louisiana, a suburb of New Orleans. The street is a private dead-end drive. In addition to a fenced back yard, there is a large wooded lot next door. The house has a living room, dining room, two bedrooms, kitchen and bath. It is completely furnished with furniture most of which was refinished by the Crowders' own hands. It is located in a residential neighborhood near a school and is sheltered from heavy traffic.

Mr. and Mrs. Crowder are members of the St. Charles Avenue Baptist Church and are regular in their attendance there.

At the time of the trial, Mrs. Crowder was pregnant with a second child — to become a brother or sister of Nettie's. The record shows that Nettie went into the Crowder home prior to the expected birth of her sibling. The record reflects that the Crowders felt it important for Nettie to anticipate and participate in the approach-

ing birth of the second child in the Crowder family. Reputable people in the Crowders' home community attested to the fact that Mr. and Mrs. Crowder have established and are maintaining a suitable home for the complete and absolute care and control of Nettie.

The record of this case is voluminous. A detailed statement of the facts would serve no useful purpose. We have deliberately drawn the mantle of judicial discretion around the somewhat sordid details brought into the evidence by the grandparents in their determined efforts to keep the little girl. We find no merit in such evidence. As in all child custody cases, the tender consideration we have for the future of the child involved causes us more concern than we experience in any other type of case. Of course it is a universal rule of law that the paramount consideration in awarding custody of minor children is the best interest and welfare of the child. However, in accomplishing this end, in order to as nearly as possible maintain a uniformity in the law, we must follow our rules heretofore laid down in prior decisions.

In *Kimberling* v. *Rogers*, 227 Ark. 221, 297 S. W. 2d 722, this Court said:

"Because human nature is as it is, no two child custody cases can ever be exactly the same; so the policy is to examine our other similar child custody cases and then see which one more nearly resembles the case at bar."

Our research reveals that the case of *Loewe* v. *Shook*, 171 Ark. 475, 284 S. W. 726, resembles the case at bar a great deal. In this case the mother sought to obtain custody of her 3 year old daughter from the paternal grandparents. After marriage the mother and father resided with the paternal grandparents where the child was born. The mother nursed and cared for the child while living with the paternal grandparents. When the husband died the mother and her child lived with her sister, her parents, her sister again, with the paternal grandparents and then back with her parents. The mother went to work leaving her child with the paternal grandparents

and visited the child during the six months she was working prior to her second marriage. After her marriage she got her child and kept it for about two weeks. She became ill and requested the paternal grandparents to keep the child until she got well, at which time they refused to give it to her. The grandparents contended that the mother was not a fit person to have the custody of her child, and endeavored to show that the mother was an immoral woman. This Court in awarding custody to the mother held:

"There can be no question in the law that, as between a mother and grandparents, the mother is entitled to the custody of her child, 'unless incompetent or unfit, because of poverty or depravity, to provide the physical comforts and moral training essential to the life and well being of her child.' *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389; *Baker* v. *Durham,* 95 Ark. 355, 129 S. W. 789.

". . . Her reputation for immorality was based largely upon the fact that she went riding at nights during that period with a married man or two. There is nothing in the record of consequence tending to show that she had continued this alleged conduct or that she has been guilty of any indiscretion since she married (her second husband) . . . The child is barely four years of age at this time, and, if her mother is conducting herself discreetly, we can see no good reason why she should be deprived of the joy of parental relationship. If she is leading and will continue to lead a righteous life, the pleasures incident to motherhood should be accorded her by the courts. According to the record, she is not lacking in affection for her child. She is keeping house in Halley, and her husband is amply able and willing to maintain, support, and educate the child. We are unable to discern anything in the record to indicate that the present and future welfare of the child will be imperiled by placing it under the care and control of the respondents." See also: *Servaes* v. *Bryant,* 220 Ark. 769, 250 S. W. 2d 134 (1952).

The case of *Parks* v. *Crowley,* 221 Ark. 340, 253 S. W. 2d 561 (1952) involved the custody of a 5-1/2 year old

girl child, the Court in reversing the trial court and awarding custody to the mother as against the paternal grandparents said:

". . . the child's father is not a party to this action. According to this record, he has never shown the slightest interest in Pamela and has never provided a home or any support for her . . . On February 28, 1949, Frances (the mother) married Parks (second husband) and they now have a son two years of age. The record discloses that on September 4, 1946, Jack Crowley (the father) secured a Florida divorce from Frances and seven days later she gave birth to Pamela. Shortly thereafter, Frances took her baby to the home of her parents in Paragould and later secured employment to support herself and child. During this period, Frances had allowed the child to stay in the home of its paternal grandparents (appellees) a greater part of the time. Appellees are good people and their affection for the child and desire to care for it are not questioned . . ." In reversing the trial court, this Court in the *Parks* case said:

"In considering this case, we do not lose sight of the fact that we are dealing with the welfare of a little girl of the tender age of five years when obviously she is most in need of the loving care of its real mother unless the mother is so depraved morally or otherwise as would render her unfit to have her child. While appellees have had her custody for most of her life, when the real mother shows that she is entitled to its custody, we must know, human nature being what it is, that the love and attachment of this little girl for her grandparents (appellees) cannot have become so deep rooted and attached that it could not, within a very short time, be transferred to her real mother by proper treatment, love and care, if given opportunity."

In the recent case of *Rayburn* v. *Rayburn*, 231 Ark. 745, 332 S. W. 2d 230, this Court reiterated the principles announced in the decisions cited hereinabove in awarding a natural parent custody of a minor child, saying:

". . . A natural parent's right to custody of a child is paramount to all others unless the parent is proved to be incompetent or unfit. See: *Cook* v. *Haynie,* 230 Ark. 174, 321 S. W. 2d 201; *Holmes* v. *Coleman,* 195 Ark. 196, 111 S. W. 2d 474; *Loewe* v. *Shook,* 171 Ark. 475, 284 S. W. 726; *Baker* v. *Durham,* 95 Ark. 355, 129 S. W. 789."

From what has been said above, the record before us, and finding no merit in the points urged by appellants for reversal, on trial *de novo* we are unwilling to say that the Chancellor's opinion (which was rendered after having observed the witnesses testifying and after having interviewed the little girl in chambers) awarding custody of the child to appellee is against the weight of the evidence.

Affirmed.

HARRIS, C. J., and HOLT, J., dissent.

CARLETON HARRIS, Chief Justice, dissenting. I feel that the Court should have granted custody of the child, Nettie Katherine, at least for the time being, to the grandparents, Mr. and Mrs. Duncan, rather than to the mother, Jeanne Duncan Lindoerfer Crowder.

The Majority have not seen fit to relate the evidence which most strongly supports the view that Mrs. Crowder is unsuitable to be given the custody of the child. Since they have not done this, I shall follow suit, for the testimony is, as the Majority state, rather sordid, and nothing would be gained by discussing the charges of immorality against appellee (a substantial part of which was admitted), other than to considerably strengthen this dissent, which, after all, is unimportant.

Suffice it to say, that the conduct referred to occurred some seven or eight years before this trial, while appellee was a student at a girls' school in a neighboring state. It may be, as Mrs. Crowder stated, in defending her conduct, that it was "mostly a case of delayed adolescence", but the admitted acts occurred during the course of a year when appellee was 19 to 20 years of age. Be that as it may,

this testimony was only a part of the evidence which I consider to indicate Mrs. Crowder's emotional instability or immaturity. A short time after her graduation, she married Frank Lindoerfer, father of Nettie, but they separated after five months. Subsequently, she went to Emory University, where she had been awarded a fellowship, in furtherance of an expressed intention to obtain advanced degrees in psychology. During this period, though still married to Mr. Lindoerfer, she dated a man named Sheldon Fein, admittedly thought she was in love with him, and discussed the subject of future marriage. The relationship with Fein was terminated because the appellants herein wrote Fein, and apparently threatened to attempt to obtain his dismissal from the school. Sometime subsequently, the fellowship awarded appellee was cancelled by the Dean of Emory University, because of her unsatisfactory scholastic record. Mrs. Crowder had been married to her present husband less than eleven months at the time of the rendition of this decree, which, under my view, is not a sufficient period of time in which to determine whether this marriage will provide a suitable home environment, or whether appellee has attained that degree of stability which is so desirable and necessary for one having the custody of a small child.

Certainly, I have no desire to punish Mrs. Crowder for "indiscretions" of youth, if, in fact, the acts mentioned in the testimony were indiscretions, rather than evidence of a fixed behavior pattern. I also recognize there are two sides to this lawsuit, and that perhaps appellants are not entirely blameless, but I am firmly of the opinion that the Court's order giving appellee custody of this child was premature; *i.e.,* her change in habits and attitudes should be more firmly established before entrusting her with the care of this little girl.

I therefore respectfully dissent.

Mr. Justice HOLT joins in this dissent.