## William Rupert BONDS *v.* Cecil Ruth Bonds LLOYD

75-315                                      535 S.W. 2d 218

### Opinion delivered April 5, 1976

*Richard L. Peel,* for appellant.

*Jon P. Shermer Jr.,* for appellee.

ELSIJANE T. ROY, Justice. Appellant William Rupert Bonds and appellee Cecil Ruth Bonds Lloyd, formerly husband and wife, were divorced in April, 1970, in Dallas, Tex-

as. Custody of their minor child, William Jonathan Bonds, was given to the mother. In July, 1975, the sister of appellee called appellant in Russellville, Arkansas, stating that appellee apparently had abandoned Jonathan and to come pick up his child. Appellant did so. The next day after appellant returned to Russellville he filed a petition for custody in the Pope County Chancery Court alleging appellee had abandoned Jonathan and was unfit to retain custody. Five weeks later appellee responded by filing a petition for a writ of habeas corpus seeking the return of the child.

After an abbreviated hearing the chancellor decreed that the child be placed with the Pope County Welfare Department. The decree further required that the Dallas Welfare Office be requested to investigate the conditions under which the child was living and to state its intention as to the custody of the child pending resolution of the action. If so desired by the Dallas Welfare Office the child could be transferred there until the Dallas County courts could determine which parent should have custody.

Appellant argued for reversal that the Chancery Court of Pope County erred in refusing to hear the case on the merits and in refusing to determine which parent should have custody.

Carolyn Presley testified she was a sister of appellee Cecil Ruth Bonds Lloyd and that she lived in Irving, Texas, a short distance from Dallas, the home of appellee. She said she frequently visited in her sister's home and often kept the children for her. The children were William Jonathan Bonds, son of appellant, who was six years of age at the time of the hearing, and Mrs. Lloyd's twin daughters, four years of age, children of her present husband. The last time Mrs. Presley kept the three children for her sister she expected her to pick them up in a few days. When she heard nothing from appellee for three weeks she called Mr. Lloyd, her sister's present husband, and requested that he come for the children because for financial and physical reasons she was unable to continue to feed and care for them. Mr. Lloyd advised her to call "Bill Bonds" and tell him to come get Jonathan, that he did not want him, and she could take the little girls to

appellee's mother, that he did not have time to take care of them.

Mrs. Presley testified her inquiries finally revealed Mrs. Lloyd had gone to California, that she had taken all of her clothes and none of the children's things. This led her to believe the children had been abandoned, and for this reason she called Jonathan's father to come for him and he was there within a few hours to get Jonathan. She testified the conditions in her sister's home were very unsanitary. That while Mrs. Lloyd was in California Mr. Lloyd asked her to come over and clean the house, at which time she found half-eaten food all over the place, even under the children's beds and "every time I swept out from under anything, out of closets . . . hundreds of roaches, not just a few at a time, but gobs of them at a time, came out from everywhere every time I swept under anything. * * * Dirty clothes in piles all over the house. It was just horrible. Absolutely horrible. The smell would have driven anybody out."

Other testimony concerning the deplorable condition of the house in which the children lived is too revolting to detail. Not until two weeks after Mr. Bonds picked up Jonathan did Mrs. Presley receive any inquiry from appellee concerning her own children.

Mrs. Ivy Sims, who lived in Texas at one time but now lives in Arkansas, testified that she used to baby-sit for appellee. Mrs. Sims essentially corroborated the testimony of Mrs. Presley as to the dirty, unkempt condition of the house and her testimony extended to the physical condition of the children as well as the house. Both women stated they had also seen evidence of maltreatment and physical abuse of Jonathan in addition to evidence of extreme neglect.

Appellant testified: Mrs. Lloyd's sister, Carolyn Presley, called me and told me that Mrs. Lloyd had disappeared and abandoned Jonathan and wanted me to come get Jonathan and take care of him. I went after my son on a Saturday two hours after Carolyn Presley called me, brought him back here, and was in my attorney's office the next Monday morning to seek custody of Jonathan. I consider that Jonathan had been neglected and abandoned by Mrs. Lloyd. I desire to

have custody of Jonathan so that I can take care of him, rear him, give him an education and the opportunity to grow up to be a fine young man. My wife has approved of this and she very much desires that we have custody of Jonathan. I have already made arrangements for Jonathan to go to school here, to collect his shot records, birth certificate and have had him examined by the doctor. I own my own home and have one child by my present wife to whom I have been married five years. On cross-examination appellant admitted he had not kept up support payments for Jonathan.

Appellant's present wife testified Jonathan's physical condition indicated he was a very much neglected child. She corroborated her husband's testimony and joined him in expressing a desire for Jonathan's custody.

In *Duncan* v. *Crowder*, 232 Ark. 628, 339 S.W. 2d 310 (1960), the Court stated:

> * * * Of course it is a universal rule of law that the paramount consideration in awarding custody of minor children is the best interest and welfare of the child. * * *

In *Larkin* v. *Pridgett*, 241 Ark. 193, 407 S.W. 2d 374 (1966), this Court said:

> . . . [T]he best interest of the child is a matter of vital importance in a habeas corpus case like this one. (Citation omitted)

The physical presence of the child in Arkansas is a proper basis for the exercise of jurisdiction by the chancery court to determine whether there should be a change in custody of the child involved, even though other courts may have concurrent jurisdiction. Leflar, American Conflicts Law § 245 (1968) and Restatement, Second, Conflict of Laws § 79 (1971).

In *Shaw* v. *Shaw*, 251 Ark. 665, 473 S.W. 2d 848 (1971), an action for divorce was filed in Bazoria County, Texas, and custody of the children was awarded to the father. The mother in an action in Miller County, Arkansas, sought

custody of the children on the basis of changed circumstances. Appellant-father contended the Arkansas chancery court failed to give full faith and credit to the Texas decree by not ordering immediate delivery of the children to him. We held in *Shaw* that the State where the child is physically present has the most immediate concern with the child and may be the best qualified jurisdiction to decide what will amount to his welfare.

This Court has held custody cases are not viewed as property cases and do not come within the rule of the full faith and credit clause of the Federal Constitution relating to foreign judgments. *Tucker v. Tucker,* 195 Ark. 632, 113 S.W. 2d 508 (1938).

Despite the above well established principles of law the trial court throughout the entire proceeding herein revealed obvious displeasure with having this matter in the Arkansas court and with appellant's actions in going to get Jonathan even though he had been called to come for the boy. The trial court repeatedly referred to appellant as a "child-snatcher", stating at one time in the hearing "That's right, and I stopped snatching kids across the state line." Appellant's testimony that he only went to get the child after he was called was verified by the testimony of his wife and Mrs. Presley. It also is to be noted that appellant was not attempting to act in a surreptitious manner since immediately upon his return to Russellville he filed a petition for custody.

The record makes it apparent that almost before hearing any testimony the court determined it was going to send the case back to Dallas, as reflected by the following excerpts from the transcript:

The Court: I think you have made a sufficient record on it now on that part of it, because I am not to try Dallas facts on this thing now with the child here less than six weeks today.

Mr. Peel: I'd just like to make my record on it. I think the Courts here in Arkansas are supposed to try them.

The Court: We are going to sit here all day long and

listen to something that better would be tried in Dallas is what I am getting at. They are all from Dallas. Let them go back home.

Mr. Peel: No, sir, not all from Dallas. There's only two from Dallas, Mrs. Presley and Mrs. Lloyd.

The Court: Who else do we have here?

Mr. Peel: I have a lady from Grady, Arkansas. I have Mr. and Mrs. Bonds, also have the child that's here right now. Most of the parties are from here, not from out of Arkansas.

The Court: What do they know about what's happening in Dallas?

Mr. Peel: Your Honor, I know what you are talking about. You want to just send it back down there.

The Court: I certainly do.

Appellant's attorney stated to the court that he would like to call Mrs. Lloyd as a witness, but the court refused, stating "I am not going to make a decision on the merits." Then the court lso commented:

He snatched the child across the state line. That's the thing, in violation of an order. That's the kind of thing I've been trying to stop for a long time, and I am not going to let this case be the exception.

Let them go there and litigate the case. I am not cutting anybody off, but I think this case needs to be in Dallas and I don't think it ought to be here at all. The child has only been here forty-one days.

In *Shaw*, supra, we held the fact that a court of this State had the power to make child custody orders regardless of simultaneous jurisdiction of the courts of other states did not require the court to entertain the suit, unless it was to the best interest of the child that the Arkansas court decide the custody action. Thus to a large extent the matter is dis-

cretionary with the court.

An abuse of discretion has been characterized as acting improvidently or arbitrarily. *Bowman* v. *Gabel*, 243 Ark. 728, 421 S.W. 2d 898 (1967). See also *Twist* v. *Mullinix*, 126 Ark. 427, 190 S.W. 851 (1916).

A review of the record herein reflects the chancellor acted in an arbitrary manner in that he determined he was going to send the case back to Dallas even before he heard the evidence to ascertain what action should be taken in the best interest of the child. The issues were drawn and all parties were personally before the court, and in reaching a decision on the matter he should have been guided by the well-established rule "that the welfare of the child is the polestar" in these cases.[1]

Also we note that despite the pleas of both the appellee-mother and the appellant-father requesting custody of Jonathan, the court placed him in custody of the Arkansas Welfare Department. The record does not reflect any reasonable basis on which the court made this decision.

Accordingly the case is reversed and remanded for proceedings not inconsistent with this opinion.

---

[1] *Haller* v. *Haller*, 234 Ark. 984, 356 S.W. 2d 9 (1962).