2010 Ark. App. 239

SOURCE LOGISTICS, INC., Appellant

v.

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING TO POLICY NO. NA041790U, Appellees.

No. CA 09–936.

Court of Appeals of Arkansas.

March 10, 2010.

Kenneth S. Hixson, Fayetteville, for appellant.

Mark Winfield Dossett, Jeffrey Michael Fletcher, Davis, Clark, Butt, Carithers & Taylor, PLC, Fayetteville, for appellee.

DAVID M. GLOVER, Judge.

Appellant, Source Logistics, purchased a cargo-insurance policy and an unattended-truck/trailer endorsement from appellee, Lloyd's of London. Thereafter, one of Source Logistics' trailers was stolen from a warehouse parking lot. The trailer was later recovered by the police, with only a portion of the cargo missing; however, the owner refused to accept the remaining cargo because of the uncertainty of the food product's safety after having been stolen. Source Logistics, therefore, submitted a claim to Lloyd's for the cargo in the amount of $22,323.70. Lloyd's denied the claim, basing its denial on the fact that the warehouse parking lot was not under constant surveillance and that Source Logistics did not lock and remove the keys from the stolen trailer. The case was presented to a jury, which returned a general verdict in favor of Lloyd's. Source Logistics raises two points of appeal, challenging the trial court's rulings on three jury instructions: 1) the trial court erred in *giving* jury instruction AMI Civ. 106A (Adverse Inference), and 2) the trial court erred in *refusing to give* proffered instructions AMI Civ. 2412(Contract Interpretation—General Rule—Ambiguity in Language) and AMI Civ. 2424 (Contract Interpretation—Construction Against One Who Drafted Contract). We affirm.

## Standard of Review

In *Williams v. First Unum Life Ins. Co.*, 358 Ark. 224, 229, 188 S.W.3d 908, 911 (2004), our supreme court explained:

We first address our standard of review. This court has consistently held that a party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to support giving the instruction. *See, e.g., Southern Farm Bureau Cas. Ins. Co. v. Daggett*, 354 Ark. 112, 118 S.W.3d 525 (2003). Moreover, this court will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Id.* Finally, we have said that it is not error for the trial court to refuse a proffered jury instruction, when the stated matter is correctly covered by other instructions. *Id.*

"A trial court abuses its discretion when it acts improvidently or arbitrarily in making a finding. *See Bonds v. Lloyd*, 259 Ark. 557, 535 S.W.2d 218 (1976). *See generally Hogan v. Holliday*, 72 Ark.App. 67, 31 S.W.3d 875 (2000), (holding that a trial court abuses its discretion by acting thoughtlessly and without due consideration)." *Wal–Mart Stores, Inc. v. U.S. Fidelity & Guar. Co.*, 77 Ark.App. 217, 224, 76 S.W.3d 895, 900 (2002).

## Factual History

Source Logistics, Inc., is a motor carrier located in Russellville, Arkansas. It transports frozen-food products from commercial warehouses to various prison facilities across the country. Source Logistics purchased a truck-cargo insurance policy from Lloyd's, which provided coverage for the period November 20, 2005, to November 20, 2006, and an unattended-truck/trailer endorsement.

Source Logistics purchased the unattended-truck/trailer endorsement because it routinely left several loaded trailers unattended at Commercial Distribution Center, a warehouse in Dallas, Texas. The trailer that was the subject of the insurance claim was left at this warehouse for loading on Friday, December 9, 2005. CDC employees loaded the trailer with cargo on Sunday morning, December 11, 2005, after which it was left unattended in accordance with a standing agreement between Source Logistics and CDC. Sometime during the night of December 11, or the early morning hours of December 12, the loaded Source Logistics trailer was stolen from the warehouse lot.

The parties stipulated that the cargo policy contained the following language:

### INSURING AGREEMENT

In consideration of the premium paid hereon ... the Underwriters at Lloyds of London hereby agree to indemnify the insured, named in the Schedule, for all risks of physical loss or damage from an external cause to lawful cargo in, and, or on, a truck *whilst in their care, custody or control in the ordinary course of transit, including loading and unloading.* ... This insurance being subject to all the provisions, exclusions, terms and conditions contained in the policy.

(Emphasis added.) In addition, the unattended-truck/trailer endorsement provided in pertinent part:

In consideration of the additional premium charged, it is hereby noted and agreed that, ... this policy is extended to include losses to cargo directly resulting from forcible and/or violent entry to unattended trucks, subject to such trucks having all their openings closed, securely locked and all keys removed. ...

No coverage is provided hereunder for loss of or damage to cargo in and/or on trailers or semi trailers which are de-

tached from power units, unless such trailers or semi trailers are

i) garaged in a building or

ii) parked in a fully enclosed yard which is securely closed and locked, or

iii) *under constant surveillance*, or

iv) on a guarded lot

*AND*

*the trailer or semi trailer has all the openings closed and securely locked with keys removed* and the period that the trailer or semi trailer is detached from the power unit does not exceed 72 consecutive hours (Sundays and holidays excluded) from the time of detachment from the covered truck or tractor.

(Emphasis added.) The italicized portions of the cargo policy and the endorsement are pertinent to the insurance claim asserted by Source Logistics and denied by Lloyd's. Additional facts will be discussed as they pertain to each instruction.

### The Giving of AMI Civ. 106A

■ For its first point of appeal, Source Logistics contends that the trial court abused its discretion in giving Jury Instruction AMI Civ. 106A, which provides:

Where relevant evidence is within the control of the party in whose interest it would naturally be to produce it, and that party fails to do so without satisfactory explanation, you may draw the inference that such evidence would have been unfavorable to that party.

The trial court restricted the use of the instruction to Source Logistics' payroll records, which were not produced at trial. Source Logistics contends that its payroll information was not relevant because it made no difference to the insurance claim whether or not it had a driver present during the loading of the trailer on Sunday morning. Lloyd's counters that the instruction was appropriate because the un-

produced payroll records were relevant to establish "care, custody, and control," a condition precedent for coverage, and also because the payroll records went to the credibility of Tim Hill, Source Logistics' president. We find no abuse of discretion in the trial court's decision to give this instruction.

In *Slaughter v. Capitol Supply Co., Inc.,* 2009 Ark. 221, 7, 306 S.W.3d 432, 436, our supreme court discussed AMI Civ. 106A:

We are cited to *Saliba v. Saliba,* 178 Ark. 250, 255–56, 11 S.W.2d 774, 776 (1928), where this court stated that an instruction similar to AMI 106A was proper where the defendant in a personal injury case arising from an automobile accident, who was driving the car, and who knew whether the injury was caused as alleged by putting the car in reverse, was present in court at the trial but did not testify. *This court concluded in Saliba that the defendant's testimony would not have been trivial or cumulative because the question was whether defendant's car was put in reverse, and the defendant was the driver. Id. In Saliba, the plaintiff showed that the defendant had knowledge relevant to the cause and chose not to testify.* La'Ronda conversely alleges that because Brenntag and Sherwood's witnesses held positions of significant authority, they must have had significant knowledge. We note that Brenntag's witness, its vice-president of production, and Sherwood's witness, an in-house engineer, were deposed, and their depositions were introduced into evidence and read at trial. *La'Ronda fails to show that the witnesses had knowledge beyond that revealed in their depositions.* We also note that while La'Ronda argues that the "failure of a party present to testify at trial supports such an instruction," neither witness she complains of was present at trial.

Instruction 106A provides that where relevant evidence is in the control of a party in whose natural interest it would be to produce it, and the party does not produce it, an inference may be found that the evidence was unfavorable. *La'Ronda identifies no relevant evidence that was in the possession of the witnesses that they would have naturally been expected to produce that was not disclosed in their depositions. Rather, she asserts that the witnesses were beyond the subpoena power of the circuit court, and that, because the two witnesses were deposed before trial and did not appear at trial, an inference must arise that their cross-examination would have been unfavorable to appellees. No such inference arises under the common law set out in Saliba, supra, or under AMI 106A. What gives rise to the inference is identified relevant evidence in the possession of a party in whose interest it is to produce it and who fails to do so without satisfactory explanation. Volunteer Transp., Inc. v. House,* 357 Ark. 95, 101, 162 S.W.3d 456, 459 (2004); *Cox v. Farrell,* 292 Ark. 177, 182, 728 S.W.2d 954, 956 (1987). The circuit court did not abuse its discretion in refusing to instruct the jury on AMI 106A. *See Williams v. First Unum Life Ins. Co.,* 358 Ark. 224, 188 S.W.3d 908 (2004).

(Emphasis added.) The "Note on Use" for AMI Civ. 106A provides: "This instruction should be used only after the court has made a determination that the evidence is sufficient to support such an inference." The *Slaughter* case explains that there are three factors that give rise to the inference, making the instruction appropriate: 1) identified relevant evidence, 2) in the possession of a party in whose interest it is to produce it, 3) who fails to do so without satisfactory explanation.

Briefly, Source Logistics explains that Lloyd's asked for only ten items in its February 14, 2006 reservation-of-rights letter, and that payroll records were not included; that during the September 2008 deposition of Tim Hill, he was asked by Lloyd's if he could identify the driver who was on site during the Sunday morning loading of the truck/trailers; that Hill responded, "I should be able to"; and that in his subsequent trial testimony, Hill explained that, while he had thought that the payroll records would reveal the requested information, when he went back and looked through them, he could not determine specifically which driver was on site that morning. Source Logistics contends that under those circumstances, it was not proper for the jury to be able to draw a negative inference from the absence of the payroll records at trial.

As part of the AMI Civ. 106A discussion, the trial court asked, "My point is, if he was unable to determine whether the employee was present or not present from the payroll records, how then are the payroll records relevant to this instruction?" Lloyd's responded that it was an issue of credibility for the jury. The court further stated: "I think you have to establish that the information was available in those records before we can go into the fact that there is an adverse [inference] that he didn't bring those records in here today." Lloyd's attorney responded in part: "I know Mr. Hill is saying that 'I looked at the records and they are not helpful,' but that's the whole point. In order for that to be the end of the issue, the jury has to believe Mr. Hill. I believe that makes it a credibility issue for the jury to have to decide whether and how much weight to give his testimony now that it's different than it was previously under oath." Source Logistics' attorney countered that that was why there was a credibility instruction and the jury could believe him or

not. He also added that Lloyd's adjusted the claim for six months and didn't ask for those records.

The following colloquy then occurred:

[TRIAL COURT]: The instruction says "when relevant evidence . . . ." okay, *I'm not going to dispute that it is relevant.* It is within control of the party whose interest it would naturally be to produce it. *Before it becomes relevant, I think you have to establish that this information is contained in those records.*"

ATTORNEY FOR LLOYD'S: I think the evidence goes both ways and I admit that it is not all in my favor, but it goes both ways and has changed, and what the jury has heard is that one answer was given during the deposition in September and a different answer is given now and they have an explanation for the change. A jury has to weigh that.

BY THE COURT: What was the explanation?

ATTORNEY FOR LLOYD'S: That he went and looked at them and they weren't available.

BY THE COURT: I guess your argument is that it's not satisfactory. Here's what I'm going to do: with respect to the one issue on payroll records, I think a company would have the records in its office showing when an employee was on duty or not on duty at a particular point and time. With respect to the payroll records, I'm going to grant this instruction but you can only argue it with respect to that one issue. With respect to surveillance and logbooks, I'm going to deny the instruction.

(Emphasis added.)

In requesting this instruction, Lloyd's relied upon the "care, custody, and control" language and argued its position that Source Logistics had not satisfied that prerequisite for coverage under the cargo policy. It is clear that the trial court wrestled with the three factors that would give rise to the inference provided in AMI 106A and concluded that the instruction was appropriate with respect to the payroll records. Lloyd's convinced the trial court the payroll records were relevant to the position taken by it, even though Source Logistics did not regard them as relevant under its theory of the case. They were in Source Logistics' possession and, in light of Lloyd's's contentions, it was in Source Logistics' interest to produce the records and explain what the records did or did not show. With respect to the payroll records, the trial court did not accept as satisfactory Source Logistics' explanation concerning the absence of those records. On this close question, we conclude that the trial court acted thoughtfully and with due consideration and that there was no abuse of discretion in allowing the instruction. We also note that even though Lloyd's argued Tim Hill's credibility as an alternative justification for giving the instruction, the trial court did not reach its decision on that basis.

### *The Refusal to Give AMI Civ. 2412 and 2424*

For its remaining point of appeal, Source Logistics contends that the trial court abused its discretion in refusing to give the proffered instructions AMI Civ. 2412 (Contract Interpretation—General Rule—Ambiguity in Language) and 2424 (Contract Interpretation—Construction Against One Who Drafted Contract). The policy language at issue under this point is part of the unattended-truck/trailer endorsement, which required that the unattended trailer be 1) garaged in a building, 2) parked in an enclosed yard, 3) under constant surveillance, or 4) on a guarded lot; *and* that the trailer have all openings closed and securely locked with keys removed. Only the language involving "un-

der constant surveillance" and "securely locked with keys removed" is pertinent to this case.[1] Source Logistics contends that this policy language is ambiguous and that the proffered instructions should have been given. Lloyd's counters that this language is not ambiguous and the trial court was correct in refusing to give the proffered instructions. We find no basis for reversal.

The facts involved with each clause are essentially undisputed. Concerning the language "under constant surveillance," Source Logistics had a lease agreement with Texas Video Security to provide video security and surveillance at the warehouse in question. According to Source Logistics, the agreement with Texas Video provided that it would provide security cameras, motion detectors, and monitoring service. The security system included three cameras, which were operational and recorded activity on the warehouse parking lot twenty-four hours a day, seven days a week. The surveillance video from the three security cameras was streamed 24/7 to a computer inside the Dallas warehouse, a computer at Texas Video Security, and a computer in the office of Source Logistics in Fort Worth, Texas. In addition, the Source Logistics manager could access the website and monitor the video feed from any location. Two motion sensors, monitoring both the north and south driveways, were part of the security system. If the motion-sensor beams were interrupted by a vehicle entering either driveway, one of the cameras was designed to automatically turn toward the area of the interrupted beam and focus on the source of the interruption. Moreover, a communication signal was automatically sent to Texas Video Security to alert

them of the problem. Monitoring services were to be provided from 6 p.m. to 7 a.m. Mondays through Fridays, and twenty-four hours a day on Saturdays and Sundays, and the police were to be called and Source Logistics alerted of any unauthorized entries. On the night of the theft, Texas Video did not call or alert either the police or Source Logistics. Source Logistics took the position that their unattended trailers on the warehouse parking lot were "under constant surveillance" as a result of the described video security system and that this requirement for coverage was thereby satisfied. Lloyd's disagreed.

Concerning the language, "securely locked with keys removed," Source Logistics explained that the CDC warehouse employees loaded a trailer with cargo and then secured the trailer door by the use of a metal strip; the trailers were not secured with locks and keys.

### Proffered AMI 2412

The proffered instruction based on AMI 2412 provided:

### CONTRACT INTERPRETATION— GENERAL RULE— AMBIGUITY IN LANGUAGE

The parties dispute the meaning of the following language in their contract:

### UNATTENDED TRUCK ENDORSEMENT

*No coverage is provided hereunder for loss or damage to cargo in a trailer which is detached from a power unit, unless:*

*a) garaged in a building; or*

*b) parked in a full enclosed yard which is securely closed and locked; or*

---

1. By agreement of the parties, another instruction, which defined "care, custody, and control," resolved the contention that the "care, custody, and control" language was ambiguous.

c) *the truck is under constant surveillance; or*

d) *on a guarded lot and*

the trailer has all openings closed and securely locked with keys removed.

The parties also dispute the meaning of the following language in the insurance policy:

*In consideration of the premium paid hereon ... the Underwriters at Lloyd's of London hereby agree to indemnify the insured, named in the Schedule, for all risks of physical loss or damage from an external cause to lawful cargo in, and, or on, a truck whilst in their care, custody or control in the ordinary course of transit, including loading and unloading.... This insurance being subject to all the provisions, exclusions, terms and conditions contained in the policy.*

It is your duty to interpret the contract to give effect to what the parties intended when they made their agreement. In determining the meaning of the language, you must take into consideration the language of the contract, the circumstances surrounding the making of the contract, the subject of the contract, the purpose of the contract, the situation and relation of the parties at the time the contract was made and the parties' subsequent custom in the trade.

### *Proffered AMI 2424*

The proffered instruction based on AMI 2424 provided:

CONTRACT INTERPRETATION— CONSTRUCTION AGAINST ONE WHO DRAFTED CONTRACT

If you cannot decide the intention of the parties after considering the instructions that I have already given you concerning the interpretations of the ambiguous language in the insurance policy, then you should interpret the ambiguous language against the party who prepared the insurance policy.

The introduction to the AMI instructions concerning contract interpretation provides in pertinent part:

A jury should not be called upon to interpret a contract unless it contains an ambiguity. A provision in a contract is ambiguous when it is susceptible to two or more reasonable interpretations. If a provision of a contract is unambiguous, its construction is an issue of law for the trial court. However, if an ambiguity exists in the contract, the meaning of the ambiguous provision becomes an issue for the fact-finder. "The initial determination of the existence of an ambiguity in a contract rests with the trial court, and if an ambiguity exists, the meaning becomes a question of fact for the fact finder." "Whether the language of the policy is ambiguous is a question of law to be resolved by the court." *Thus, the following instructions, with the exception of AMI 2423, should be given only when the court has made the initial determination of the existence of an ambiguity.* AMI 2423 may be necessary in cases in which there is no alleged ambiguity. In addition, the use of these instructions should be tailored to the particular interpretation issue presented.

In *Smith v. Prudential Property and Cas. Ins. Co.*, 340 Ark. 335, 10 S.W.3d 846 (2000), the Supreme Court clarified the law regarding the interpretation of ambiguous contracts. The Court held that even when a contract is ambiguous, if the meaning of the ambiguity does not depend on disputed extrinsic evidence, the construction and legal effect of the contract remains a question of law. The Court expressly overruled *Farm Bureau Mut. Ins. Co. v. Whitten*, 51 Ark.App. 124, 911 S.W.2d 270 (1995), to the extent that *Whitten* held that when the terms

of a written contract are ambiguous, its meaning is always a question of fact.

These instructions should not be given in cases involving the interpretation of ambiguous provisions of insurance contracts in which the insured had no opportunity to negotiate or change the terms of the contract, and the meaning of the ambiguity does not depend on disputed extrinsic evidence. The Arkansas Supreme Court and Court of Appeals have made it clear that in such cases, all ambiguities will be resolved in favor of the insured as a matter of law. Where ambiguity does depend on disputed extrinsic evidence, these instructions may be appropriate even pertaining to a contract of insurance.

(Emphasis added and selected citations omitted.) The "Note on Use" to AMI 2412 provides: "This instruction should be given only if the court has determined that the contract contains ambiguous language, and that the meaning of the ambiguous language depends upon disputed extrinsic evidence."

During the discussion with the trial court regarding these two proffered instructions, Source Logistics argued that the following contract language was ambiguous: 1) constant surveillance, and 2) sealed locks. The trial court initially stated that "the policy says what it says, and with respect to locks, I don't have a problem with ambiguity. But on the other part, I may have a problem under surveillance." The colloquy continued:

ATTORNEY FOR LLOYD'S: I think the meaning is clear and unambiguous. The parties can argue whether the facts established the meaning or not.

BY THE COURT: The way I understand it, if it is [susceptible] to two different meanings, it's not how we surveil, okay? How his client got it done, you know, that's a key issue in this case. But does surveillance mean two different things in this insurance agreement?

ATTORNEY FOR SOURCE LOGISTICS: We say it does. He says I've got to have eyes on it twenty-four/seven and I say I've got to surveil it twenty-four/seven, I've got to have cameras on it. Does that mean cameras on it? Does it mean a person watching?

BY THE COURT: That's how you do it.

ATTORNEY FOR SOURCE LOGISTICS: But that's two different definitions of surveillance.

BY THE COURT: I'm not going to grant 2424. I'm not going to give this instruction, so I guess I'm granting the defendant's motion.

ATTORNEY FOR SOURCE LOGISTICS: Plaintiff proffers Instruction No. 1 [2412] and AMI 2424 and plaintiff proffers No. 2 [2424] and incorporate by reference my previous positions instead of stating it all over again.

Although not as clear as we might hope, the above colloquy can be read to conclude that the trial court did not consider either of the challenged policy clauses to be ambiguous.

### "Securely locked with keys removed"

■ We can quickly dispose of Source Logistics' argument that the language, "securely locked with keys removed" is ambiguous because we agree with the trial court's finding as a matter of law that this language is not ambiguous. Source Logistics acknowledges that neither locks nor keys were used to secure the loaded trailers, and the language is simply not susceptible to two or more reasonable interpretations under the circumstances of this case.

Moreover, Source Logistics' argument that a separate document, dated February 3, 2006, and having a heading of "BISYS RISK MANAGEMENT SERVICES," could somehow alter the policy language itself is simply not convincing. The docu-

ment appears to be a questionnaire. The pertinent questions and responses concerning locks are: "Vehicle: cargo locks N/A door locks N/A sealed locks Yes." It is upon these responses that Source Logistics relies to support its position that the endorsement language is ambiguous. We agree with Lloyd's that the purpose and circumstances of this document were not made clear at trial, and the document was certainly not convincing to the trial court in reaching its decision concerning the asserted ambiguity of the endorsement language.

### "Under constant surveillance"

We have more difficulty determining whether the trial court erred as a matter of law in deciding that the language, "under constant surveillance," was not ambiguous. We hold that the trial court erred in this determination, but that the error was harmless. Under the terms of the endorsement, Source Logistics was only entitled to coverage if it satisfied both of the challenged requirements contained in the unattended-truck/trailer endorsement, *i.e.,* that the trailer was "under constant surveillance" *AND* that the "trailer has all the openings closed and securely locked with keys removed." For the reasons previously discussed, we found no abuse of the trial court's discretion in refusing to give the requested instructions concerning the "securely locked with keys removed" language. Consequently, even though we conclude that the trial court erred in holding that the "under constant surveillance" language was not ambiguous, the outcome would not change.

Affirmed.

ROBBINS and MARSHALL, JJ., agree.